UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LUIS RAFAEL FIGUEROA, JR.

                              Plaintiff,                     Docket No.

       -against-

                                                  **COMPLAINT**

MERRICK B. GARLAND, in his official capacity
as the Attorney General of the United States and
Head of United States Department of Justice and,
UNITED STATES MARSHALS SERVICE,

                             Defendants.
----------------------------------------------------------X

## NATURE OF ACTION

Plaintiff, LUIS FIGUEROA, ("FIGUEROA" and "Plaintiff") brings this action against defendants MERRICK B. GARLAND, in his official capacity as the Attorney General of the United States and Head of United States Department of Justice and, UNITED STATES MARSHALS SERVICE, ("DOJ," "USMS" or collectively, "the Agency" and "Defendants") for Plaintiff's claims and damages Plaintiff suffered as a result of Defendants' discrimination, a hostile work environment and reprisal (retaliation) against Plaintiff for complaining of and opposing discrimination based on his age in violation of Section 15 of the Age Discrimination in Employment Act, 29 U.S.C. § 633(a) (ADEA)., race, color and national origin (Complainant is Hispanic, dark skinned and Puerto Rican) in violation of Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (Title VII) and 42 U.S.C. § 1981 (Section 1981), and disability in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 (Rehabilitation Act), and all other applicable statutes. Pursuant to 42 U.S.C. § 2000e-5(g) all available relief is sought for these unlawful employment practices.

## JURISDICTION

1.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(4).

2.      This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII, Section 1981, ADEA and the Rehabilitation Act.

## VENUE

3.      As the unlawful practices complained of herein occurred within the Southern District of New York, venue is proper in this District pursuant to 28 U.S C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.      Plaintiff has exhausted his administrative remedies. Plaintiff filed several formal complaints of discrimination with the Agency and received a final decision on his appeal to the EEOC on June 22, 2021.

## PARTIES

5.      Plaintiff, a 51-year-old, Puerto Rican male (dark skinned), is a citizen of the United States of America and currently a resident of the State of New York.

6.      At all times relevant to this suit, from 2001 until his disability retirement in October 2017, was employed as a Detention Enforcement Officer with the USMS assigned to the United States District Court for the Southern District of New York.

7.      Plaintiff was one of many USMS officer first responders who assisted at the site of the terrorist attack on the World Trade Center on September 11, 2001 and worked at the site during recovery efforts in the days and months following.

8.      As a result, like many other people who worked at the site and lived in the area, Plaintiff developed disabling severe asthma and respiratory problems that required ongoing

treatment, limited some of Plaintiff's major life functions, such as sleeping, lifting, breathing, working, and required accommodation in the form of regular leave for medical appointments and treatment.

9.     Defendant GARLAND is the Attorney General of the United States, a cabinet level position of the Executive Branch of the federal government, which is appointed by the President and in that capacity, GARLAND oversees the DOJ and a bureau of this agency, the USMS.

10.    The DOJ is an agency of the United States federal government, created by Congress, to be the "chief enforcer of federal laws," "empowered to handle all criminal prosecutions and civil suits in which the United States ha[s] an interest."

11.    The USMS "is a bureau within the Department of Justice and receives direction from the Attorney General through the Director, USMS."  The USMS is "the enforcement arm of the federal courts, involved in virtually every federal law enforcement initiative." USMS staff protects the federal judiciary, apprehends federal fugitives, seizes property acquired by criminals through illegal activities, houses and transports federal prisoners and operates the Witness Security Program.

12.    Plaintiff's role as a Detention Enforcement Officer was to assist with transport and housing of federal prisoners in the SDNY.

## STATEMENT OF FACTS

13.    Plaintiff was employed with the USMS at the SDNY as a Detention Enforcement Officer Grade 7, from February 2001 until 2017 when he was granted disability retirement.

14.    The discrimination and retaliation claims described herein took place in the SDNY from on or about December 2016 through 2018.

15.     At all times relevant to this complaint, Plaintiff's first line supervisors were Stuart Smith, Supervisory Deputy U.S. Marshal, and John Csakany, Chief Deputy U.S. Marshal.

16.     Plaintiff was 45 years old at the time the unlawful discrimination and retaliation described herein began and he is now 51 years old.

17.     Plaintiff is Hispanic, of Puerto Rican descent and dark-skinned.

18.     Plaintiff has a disability caused by severe asthma, sinus problems and respiratory problems, which he developed as a result of his work at the site of the World Trade Center terrorist attack on September 11, 2001.

19.     Plaintiff was granted disability retirement as a result of his medical condition, which required continued accommodation while he was employed by the USMS at the SDNY in the form of medical leave for treatment of his condition.

20.     Initially in 2017, Plaintiff filed a formal administrative complaint of discrimination with the DOJ, which was amended multiple times due to continuing discrimination and retaliation through the date of Plaintiff's disability retirement in October 2017 and concerning subsequent acts of retaliation in 2018.

21.      The Agency investigated the following issues accepted for Plaintiff's formal complaint of discrimination:

Whether the Complainant [Plaintiff] was discriminated against, subjected to a hostile work environment and experienced reprisal when,

(1) On February 8, 2017, Complainant's supervisor accused him of lying about his time and attendance;

(2) On February 2, 2017 and January 17, 2017, Complainant's leave requests were denied;

(3) On December 27, 2016, Complainant was charged with Absent Without Leave (AWOL);

(4) Sometime after December 16, 2016, Complainant's face was removed from an office picture;

(5) On March 15, 2017, Complainant's supervisor threatened to charge him with Absence Without Leave (AWOL) if he reported to work late that day;

(6) On March 20, 2017, Complainant's supervisor accused him of needing to use more professionalism;

(7) On March 24, 2017, Complainant's supervisor denied his leave request and did not approve the request until Complainant showed him a copy of his leave balances;

(8) On June 27, 2017, Complainant's supervisor questioned him about his time and attendance and threatened to change Complainant's reporting time on the official sign-in sheet; and

(9) On August 5, 2017, Complainant's supervisor sent him emails at 11:15 pm concerning leave for medical appointments and instructed Complainant to correct a doctor's note and/or provide a response within 72 hours.

(10) While reviewing his submitted retirement papers, on September 25, 2017, Complainant noticed that a disciplinary letter (unrelated to his retirement package) was submitted to the Agency retirement

specialist by his first-level supervisor, which Complainant alleged was an attempt to sabotage his disability retirement;

(11) Complainant served on an unfair leave restriction for over a year without an evaluation of his attendance in order to be removed from the leave restriction;

(12) A sign in/sign out sheet implemented for Complainant's use was abolished by management after Complainant's retirement on October 28, 2017;

(13) On January 3, 2018, Complainant's request for retirement credentials was denied and, on February 8, 2018, his request for reconsideration of the retirement credentials was also denied; and

(14) On October 10, 2017, a Human Resources Manager made degrading comments about Complainant while on a recorded conference call with Labor Relations and Union personnel: "That's my dog Louie, I locked him in the room because he doesn't have a college degree."

22.     The Agency dismissed claims (1) and (3) pursuant to 29 C.F.R. § 1614.107(a)(4) as allegedly having been pursued in negotiated grievance proceeding.

23.     The Agency initially accepted claims (10) through (13) and dismissed claim (14) pursuant to 29 C.F.R. § 1614.107(a)(1), for allegedly failing to state a claim. Subsequently, it dismissed claim (11) pursuant to 29 C.F.R. § 1614.107(a)(4) as allegedly having been pursued in negotiated grievance proceeding.

24.     In 2010, Plaintiff provided a letter from his treating physician to his them first line supervisors, Supervisory Deputy U.S. Marshals (SDUSMs) Albert Carrasco and Jack McCallum, who in turn provided the information to Chief Deputy U.S. Marshal (CDUSM) John Csakany.

25.     SDUSM Albert Carrasco later informed Plaintiff that CDUSM John Csakany stated, "I was there and nothing happened to me."

26.     In 2016, the Federal District Court for the SDNY displayed a beautiful 9/11 memorial exhibition in the front lobby.

27.     On December 16, 2016, Plaintiff visited the memorial and noticed that it included a reproduction of a photograph of a group of deputies and officers who posed for a group picture on the days after the World Trade Center collapsed.

28.     When Plaintiff examined the photograph, he noticed that the portion where he had been depicted was cropped out.

29.     Plaintiff asked to the Marshal about it and received an email response from his Secretary that he was not available, but that Chief Deputy U.S. Marshal Eric Timberman would speak to him sometime in the next week.

30.     Timberman informed the Plaintiff that it would cost too much money to have the picture done over but that he would look into it.

31.     Plaintiff did not hear back from Timberman and on November 7, 2016, sent him a follow up email, to which he did not receive a response.

32.     Plaintiff sent another email on November 17, 2017, and informed Deputy Chief Timberman that he would be happy to pay the cost to have the photograph reproduced again with his own personal funds.

33.     Timberman responded that he would get back to the Plaintiff with information on the cost, but never did.

34.     Plaintiff was informed that supervisors approved the photographs chosen and the reproductions used for the memorial.

35.     Some of those reproductions included a superimposed image of the Marshall, and Plaintiff did not see any other group photos cropped to cut individuals out of the image.

36.     Based on this, and the fact that at the time, it was well known that Plaintiff was already a named Plaintiff in a failure to promote/discrimination class action complaint filed by a class of Detention Enforcement Officers assigned to courts in several locations nationwide, Plaintiff believes he was deliberately cut out of the photograph.

37.     On January 7, 2017, Plaintiff requested 8 hours sick leave to go to a physician's appointment for his respiratory conditions on January 18, 2017.

38.     When Plaintiff arrived to work on January 17, 2017 SDUSM Smith called Plaintiff to the operations desk and to question him about the leave request, at which time Plaintiff realized that he requested 8 hours sick leave in error as he had only intended to request 4 hours Leave With Out Pay (LWOP)  for this appointment and he informed  Smith that he needed to edit the request to correct the error.

39.     SDUSM  Smith questioned Plaintiff further about the leave request and the reason why Plaintiff wished to use 4 hours sick and 4 hours of LWOP.

40.     Plaintiff attempted to explain why he needed the time (time for travel, allowance for traffic, wait time, etc. ), as requested, but Smith ordered Plaintiff to request only 4 hours LWOP from 12:00PM to 4:00PM for and report to work for the 4 hours before the appointment.

41.     Plaintiff did not argue, responded, "Ok" and walked away Smith believing that the conversation was over.

42.     Smith immediately call Plaintiff back and scolded Plaintiff, telling him not to walk away when he was talking to him.

43.     Plaintiff again replied "Ok," without argument, stated that he understood and proceeded to his post believing again that the conversation was again over.

44.     Smith called Plaintiff back again and yelled at the Plaintiff, telling him not to walk away from him again.

45.     Plaintiff responded  "Ok, I thought the conversation was over," and Smith, in a loud angry tone, within earshot of all the staff in the operations area, ordered Plaintiff to his office and yelled that Plaintiff was being insubordinate.

46.     Plaintiff once again explained to Smith that he believed the conversation was over. Plaintiff also told Smith that he was not comfortable with Smith making statements about his 9/11 related medical appointments in front of other staff, to which Smith responded in a very loud tone that could be overheard, "Aren't you the one that wanted his face up on the memorial?"  Only then did Smith order Plaintiff to report to his post.

47.     Smith did not similarly verbally abuse or scold any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group

48.     On January 7, 2017, Plaintiff submitted a leave request for a dentist appointment on February 3, 2017.

49.     The request was prematurely denied on January 12, 2017, by SDUSM Smith because Plaintiff did not have sufficient leave accrued on January 12, 2017, however, Plaintiff would have had enough leave accrued before February 3, 2017, when he intended to take the leave.

50.     Additionally, Plaintiff had been instructed to request leave as far in advance as possible.  Smith did not similarly deny leave for any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group

51.     On March 14, 2017, New York City was hit with a snowstorm in cold weather that turned into ice the next morning

52.     . The next morning on March 15, 2017, Plaintiff called his supervisor at 6:27 AM, a little more than an hour before his shift to advise him that his car was stuck in ice and that he might not make it in for his shift on time.

53.     SDUSM Smith told the Plaintiff that his excuse was insufficient, and that if he arrived late, he would be listed as Absent Without Leave (AWOL) and referred to Internal Affairs for a disciplinary investigation.

54.     Because of this malicious and unreasonable threat, Plaintiff struggled to get his car out of the ice, sped to work in unsafe icy conditions and made it to work just in time.

55.     Smith did not similarly threaten any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group.

56.     On March 20, 2017, Plaintiff requested official time later that day for Union duties as allowed by the collective bargaining agreement with the Agency.

57.     Smith advised Plaintiff that since he had not requested "time off" a week before he might not be able to grant the request.

58.     The Plaintiff emailed Smith to advise that his request was for Union time ("official time") and not for annual leave for which he did not have to make a request so far in advance.

59.    Smith responded by walking close to Plaintiff's cubicle and declaring in a menacing tone, "Mr. Figueroa, that is not how you're going to get your Union Time approved". "You need to up your level of professionalism"

60.    Smith did not similarly harass or menace any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group

61.    On March 24, 2017, SDUSM denied Plaintiff's leave request stating that he did not have sufficient leave for the request which was made on March 2, 2017 for leave on March, 31, 2017.

62.    Smith erroneously stated that Plaintiff only had 6.15 hours of leave, when in fact he had 14.5 hours of leave available.

63.    Although Plaintiff advised Smith that he had sufficient leave, Smith state that he had "counseled" Plaintiff several times that he must have sufficient leave before making a request. It took Plaintiff more than a half hour to convince Smith who only relented when Plaintiff printed out the leave balance record that Smith also had access to review.

64.    Smith did not require the same of any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group

65.    On July 27, 2017, at about 7:25AM, Plaintiff was stuck in traffic behind a garbage truck within two minutes of the courthouse.

66.    Realizing that he would be late to work, Plaintiff called the operations desk and spoke to Supervisor Harrison to advise him of this predicament.

67.    Once Plaintiff arrived at work, he initialed his name on the sign-in sheet where Supervisor Harrison noted that he arrived at 7:40AM.

68.     SDUSM Smith asked Plaintiff how long it would take for him to get to his post, to which Plaintiff replied that he would report as soon as he changed into his uniform.

69.     DEOs are not allowed to travel to work in uniform and are allowed a 10 minute "doffing and donning" period once they arrive for their shift to change, pursuant to the collective bargaining agreement with the Agency.

70.     In violation of this agreement, once the Plaintiff was changed and headed to his post at 7:50AM, Smith chastised him loudly and told him that he had signed him in at 7:51AM.

71.     When Plaintiff protested, citing the Union rule, Smith told him he signed him in at a later time "Because you are going to your post now." Plaintiff responded that he was not being treated fairly and that he was allowed time to change, to which Smith responded "No you were not ready," and ordered Plaintiff to his post.

72.     Smith did not similarly admonish any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group. In fact, Smith frequently turned a blind eye to other DEOs who changed after the start of their shift, even when they arrived late, and stopped work early to leave and change before the end of their shift.

73.     On Saturday, August 5, 2017, at 11:15 PM, SDUSM Smith sent Plaintiff emails demanding medical documentation or a doctor note to support Plaintiff's leave requests for this purpose.

74.     This was a Saturday evening during off duty hours when Plaintiff could not have obtained the information requested.

75.     Additionally, Plaintiff was not required to provide medical information or doctor notes for regular sick leave requests, yet Smith had made multiple inappropriate requests for such information.

76.     Smith threatened to deny the leave without the requested information.

77.     Smith did not similarly threaten any other DEOs who were not dark-skinned Puerto Rican, disabled or in Plaintiff's age group

78.     Plaintiff had already filed formal discrimination complaint before 2017 alleging a a hostile environment, ongoing retaliation for class action participation, discrimination related to his 9/11 disability and being singled out by management which was settled by the Agency and Plaintiff.

79.     After reaching a settlement in that complaint, the discrimination and retaliation complained of herein escalated resulting in the administrative complaint initially filed by the Plaintiff in 2017.

80.     This unlawful conduct continued, and Plaintiff had to amend his administrative complaint with the Agency several times.

81.     SDUSM Smith had a different set of rules that he applied to Plaintiff, particularly concerning leave requests for medical appointments.

82.     Smith insisted that Plaintiff provide him and other supervisors doctor notes for all of Plaintiff's appointments, even routine ones for which he used his own annual or regular accrued sick leave, which was inconsistent with Agency policy.

83.     On September 25, 2016, Plaintiff was placed on an unfair leave restriction due in large part to his use of leave for treatment of his 9/11 related disability.

84.     Smith did not follow the terms of the restriction, but instead attempted to thwart any leave use by Plaintiff and place more restrictions and requirements on him that the leave restriction required.

85.     When Plaintiff finally decided to apply for disability retirement in January 2017, Smith was the first level supervisor who was responsible for providing personnel information requested for that application.

86.     Smith attempt to sabotage Plaintiff's retirement application by falsely claiming that he was under investigation and subject to discipline.

87.     As part of Plaintiff's retirement package, Smith included a 2013 and 2016 leave restriction letter, emails concerning formal counseling connected with the 2016 leave restriction letter and a 2012 memorandum outlining "performance concerns" and counseling, all of which had been grieved and resolved with no further discipline.

88.     Additionally, the leave restriction letters each expressly state in the body of the letter that they are not to be made part of Plaintiff's official record and thus should not have been included with his retirement package.

89.     SDUSM Smith was aware of Plaintiff's EEO activity since he had been named in several the complaints that Plaintiff filed with the Agency before Smith submitted his portion of Plaintiff's retirement package.

90.     Plaintiff was officially granted disability retirement effective October 28, 2017.

91.      Plaintiff had also named several other supervisors in previous EEO complaints who were aware of his prior EEO activity including, Deputy James Conn, Deputy Joel Blackman, Chief Eric Timberman, Chief John Duncan, Chief John Czakany, USM Joseph Guccione, some of which had been settled.

92.     Deputy Joel Blackman placed Plaintiff on an indefinite leave restriction in 2016 (which Smith provided in Plaintiff's retirement package)

93.     The leave restriction, which was indefinite and had been in place for about one year before Plaintiff submitted his application for disability retirement, was discriminatory on the basis of his 9/11 related disability.

94.     The leave restriction unfairly and indefinitely disciplined Plaintiff for the use of accrued sick time, leave time and AWOL hours that Plaintiff needed to take for medical appointments and treatment related to that disability.

95.     Even after Plaintiff was able to abide by the leave restrictions for an extended period of time, they were left in place and were not lifted.

96.     Other DEOs and USMs in his department who used leave time as frequently as Plaintiff did, but did not have a disability, were not placed on the same type of restriction.

97.     This was the second indefinite leave restriction placed on Plaintiff by Deputy Blackman.  The first was in 2013.

98.     The second restriction was issued after Plaintiff complained about Deputy Blackman and several other supervisors in EEO complaints.

99.     Plaintiff followed the requirements of the 2016 leave restriction and was not late for over 6 months.

100.     Nonetheless, Plaintiff was not re-evaluated by Deputy Smith or any other supervisor, the leave restrictions were left in place indefinitely and management did not indicate that it would ever be lifted.

101.     Plaintiff spoke to a number of supervisors on various occasions after he was placed on leave restriction in September 2016, including, Deputy Blackman, Deputy Smith, Internal Affairs Inspector Kristy Parker and Internal Affairs Inspector David Neumann.

102.    During each of these conversations Plaintiff discussed that the leave restriction was indefinite and unwarranted and he expressed to each of these individuals that he believed he was being retaliated against by management.

103.    Deputy Blackman and Deputy Smith insisted that the leave restriction would only be lifted when Plaintiff showed them that he could be taken off, however, neither provided any guidance on what that might take, and it was never lifted.

104.    No one else in Plaintiff's department was subjected to the same type of treatment.

105.    On September 16, 2016, a sign in sheet was implemented by USM SDNY management.

106.    Plaintiff was the only one being watched by management when he signed in and signed out.

107.    Plaintiff witnessed numerous employees leave the office without signing out and/or inputting the end of their shift (4:00 PM) leaving the office at 3:30 PM almost every day and nothing was ever said to them.

108.    On September 1, 2017, the whole early shift was let go home at 1PM and allowed to claim up to 4 PM and Plaintiff was not informed nor included, so he stayed in the office until the end of his shift.

109.    On December 27, 2016, at approximately 11:00 AM, Plaintiff was called into a meeting by Smith.

110.    His shift was from 7:30 AM to 4:00 PM and at approximately 11:00 AM the meeting was cancelled and rescheduled to 11:15 AM by Smith.

111.    The meeting began at approximately 11:15 AM and lasted approximately 35 to 40 minutes with Smith, Supervisor Gomez and Union Vice President Joseph Cimaglia in the capacity of Union Representative for me.

112.    The meeting was scheduled during Plaintiff's meal period that should have started at 11:00 AM.

113.    Due to this meeting, Plaintiff was not allowed to take a meal period at 11:00 AM and immediately started my his Official Meal Time at 12:00 PM after the meeting.

114.    At approximately 1:00 PM, Plaintiff witnessed an employee on his shift with his personal clothes on and out of uniform getting on the elevator to go home.

115.    Plaintiff was also informed by an employee on the afternoon shift that the morning shift employees were allowed to go home for the day.

116.    At approximately 1:24 PM, Plaintiff called Smith, who also was not in the office and sounded like he was in a car and informed him that all other employees on the shift were allowed to go home for the day.  He asked if he was allowed to leave as well.

117.    Smith informed Plaintiff that he was on "Union time" until 4:00 PM and had to stay until that.

118.    Plaintiff then went to the Union office and started to work on Union issues.

119.    After completing the Union issues for the day and realizing that he had not taken a lunch break, Plaintiff went to the operations desk at approximately 2:25 PM and asked the operations Supervisor USM Romain Ramdas if Smith was in his office so that he could ask him if he could leave for the day.

120.    Ramdas informed Plaintiff that Smith was not in, but that he could speak to Chief Saleh instead.

121.    After explaining his situation to Chief Saleh, Plaintiff received permission to leave for the day and left at approximately 2:45 PM.

122.    Like everyone else, and because Plaintiff was also attending to Union business on the way home, he signed out at 16:00 hours.

123.    On December 29, 2016, Plaintiff was informed by Smith that he would be charged AWOL instead of Official Time from 2:45 PM to 4:00 PM and he was reported to Internal Affairs.

124.    The sign in sheet was abolished soon after Plaintiff retired.

125.    Plaintiff submitted a request for his retirement credentials on October 17, 2017 to Chief Peter McCauley.

126.    Plaintiff received a letter in response to his request dated January 28, 2018.  The pertinent language in the letter states "A review of USMS work records revealed substantial allegations of misconduct against you at the time of your separation, which were significant enough that granting retirement credentials is not in the best interest of the USMS."

127.    Plaintiff submitted a request for reconsideration through his counsel by letter on January 31, 2018 to Acting Chief Jared Gosselin.

128.    The request informed Chief Gosselin that Plaintiff believed that the denial of his request for retirement credentials was in retaliation for his pending complaint of discrimination with the Agency and that there in fact were no pending misconduct allegations against me at the time of my retirement.

129.    The response dated February 8, 2018 referenced "Work records revealed open allegations of misconduct against you at the time of your separation, which were significant enough that granting retirement credentials is not in the best interest of the USMS" and "In

addition, it has become known that you have had negative contact with law enforcement post retirement.  Therefore, your request for reconsideration is denied."

130. None of that was true.

131. When Plaintiff submitted his application for disability retirement, there were no pending complaints against him.

132. As soon as he submitted his application, however, Smith began submitting complaints about minor infractions to Internal Affairs that would normally not trigger a complaint or any discipline.

133. Nothing ever happened with these complaints and none were ever deemed founded.

134. Upon information and belief, Plaintiff believes, based on his treatment of Plaintiff, that Smith was making the complaints to Internal Affairs in an attempt to get him fired before he was granted a disability retirement, or to make sure he retired not in good standing with the agency to retaliate against him for hos EEO activity.

135. Internal Affairs officers interviewed Plaintiff on two separate occasions, he never received a disposition nor was he ever brought up on charges or otherwise disciplined for any of the complaints with Internal Affairs.

136. By the time Plaintiff was granted disability retirement in October 2017, the time for the agency to act on any of those complaints, had they been founded and corroborated, had long expired.

137. Without his retirement credentials, Plaintiff cannot take advantage of employment opportunities that require him to have the ability to possess and carry a firearm.

138. This results in a loss of significant potential employment and earning opportunities.

## FIRST CAUSE OF ACTION
## Race and National Origin Discrimination
## Pursuant to Title VII

139.     Plaintiff repeats, reiterates and realleges paragraphs 1 to 138 of this complaint as if fully set forth herein.

140.     By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race (Hispanic) and national origin (Puerto Rican) in violation of Title VII in that Plaintiff was treated unfairly and differently than similarly situated employees not in the same protected class.

141.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of Defendants' discriminatory acts.

## SECOND CAUSE OF ACTION
## Retaliation Pursuant to Title VII

142.     Plaintiff repeats, reiterates and realleges paragraphs 1 to 141 of this Complaint as if fully set forth herein.

143.     By the acts and practices described above, Defendants have retaliated against Plaintiff, in violation of Title VII, for complaining of and opposing discrimination on the basis of his race and national origin, by subjecting Plaintiff to unfair discipline not experienced by others not in his protected class and who had not engaged in prior EEO activity and denying Plaintiff his retirement credential claiming that he did not retire in good standing from the Agency.

144.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of Defendants' discriminatory retaliation.

### THIRD CAUSE OF ACTION
### Discrimination Pursuant to Section 1981

145.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 144 of this complaint as if fully set forth herein.

146.    Section 1981 prohibits discrimination on the basis of race and color in the terms, conditions and privileges of employment and retaliation for a person's opposition to race and color discrimination and engaging in any activity protected under Section 1981.

147.    At all times relevant herein, plaintiff was an employee and a qualified person within the meaning of Section 1981 and a member of one of the various classes of persons protected by Section 1981 as a non-white, dark-skinned, Hispanic Puerto Rican male.

148.    As described above, defendants with malice and with reckless indifference to Plaintiff's federally protected rights, willfully discriminated against Plaintiff in the terms and conditions of his employment by denying him the same benefits and privileges given to similarly situated employees and retaliating against Plaintiff for opposing defendants' racially discriminatory practices by the conduct described above.

### FOURTH CAUSE OF ACTION
### Retaliation Pursuant to Section 1981

149.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 148 of this complaint as if fully set forth herein.

150.    As described above, defendants with malice and with reckless indifference to Plaintiff's federally protected rights, willfully discriminated against Plaintiff in the terms and conditions of his employment by denying him the same benefits and privileges given to similarly situated employees and retaliating against Plaintiff for opposing defendants' racially

discriminatory practices by the conduct described above.

151.    Defendants' disparate treatment of Plaintiff also constitutes retaliation in violation of Section 1981 as it took place as a result of an in connection with Plaintiff's protected EEO activity complaining of and opposing unlawful discrimination of him based on his race and color as described above.

152.    Defendants engaged in their retaliatory actions with malice and with reckless indifference to Plaintiff's federally protected rights.

153.    Defendants' actions described above directly and proximately have caused, and continue to cause, Plaintiff to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to his professional reputation.

**FIFTH CAUSE OF ACTION**
**Age Discrimination Pursuant to the ADEA**

154.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 153 of this Complaint as if fully set forth herein.

155.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his age in violation of the ADEA by treating Plaintiff differently than his younger similarly situated peers.

156.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of Defendants' discriminatory acts.

**SIXTH CAUSE OF ACTION**
**Retaliation Pursuant to the ADEA**

157.    Plaintiff repeats and realleges paragraphs 1 to 156 of this Complaint as if fully set forth herein.

158.    By the acts and practices described above, Defendants have retaliated against Plaintiff for complaining of and opposing age discrimination in violation of the ADEA.

159.    Plaintiff is now suffering irreparable injury and monetary damage from Defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

**SEVENTH CAUSE OF ACTION**
**Disability Discrimination Pursuant to the Rehabilitation Act**

160.    Plaintiff repeats, reiterates and realleges paragraphs 1 to 159 of this Complaint as if fully set forth herein.

161.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of his disability age in violation of the Rehabilitation Act by subjecting him to unfair and unwarranted discipline related to the use of medical leave which was an accommodation for his disability and subjecting Plaintiff to different standards for the use of his leave than those to which similarly situated employees like Plaintiff who were not disabled were not required to abide by.

162.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of Defendants' discriminatory acts.

**EIGHTH CAUSE OF ACTION**
**Retaliation Pursuant to the Rehabilitation Act**

163.    Plaintiff repeats and realleges paragraphs 1 to 162 of this Complaint as if fully set

forth herein.

164.    By the acts and practices described above, Defendants have retaliated against Plaintiff for complaining of and opposing disability discrimination in violation of the Rehabilitation Act.

165.    Plaintiff is now suffering irreparable injury and monetary damage from Defendants' retaliatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an award:

(a)    directing Defendants to pay Plaintiff compensatory damages, in an amount that exceeds the jurisdictional minimum of this court;

(b)    directing Defendants to pay Plaintiff punitive damages;

(c)    directing Defendants to pay an additional amount to compensate Plaintiff for the emotional distress and reputational damage Defendants' unlawful conduct has caused Plaintiff, an amount that exceeds the jurisdictional minimum of this court;

(d) directing Defendants to grant Plaintiff his retirement credentials;

(d)    awarding Plaintiff such interest as is allowed by law;

(e)    awarding Plaintiff his reasonable attorneys' fees and costs; and

(f)    granting such other and further relief as the Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial

by jury in this action of all issues so triable.


Dated:  New York, New York
       September 20, 2021

                        LAW OFFICE OF
                        CHRISTINE A. RODRIGUEZ

                        By: Christine A. Rodriguez
                        Attorneys for Plaintiff
                        11 Broadway, Suite 615
                        New York, New York 10004
                        (212) 430-6525
                        christine@crodriguezlaw.com