UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/6/2022
```

-----------------------------------------------------------------X

LUIS RAFAEL FIGUEROA, JR.,                          :
                                                    :
                                    Plaintiff,      :
                  -against-                          :          1:21-cv-7849-GHW
                                                    :
MERRICK B. GARLAND, *in his official capacity as*   :          <u>MEMORANDUM OPINION &</u>
*the Attorney General of the United States and Head of*  :               <u>ORDER</u>
*United States Department of Justice, et al.,*       :
                                                    :
                                    Defendants.     :
-----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Luis Rafael Figueroa, Jr., worked for the United States Marshals Service as a Detention

Enforcement Officer from February 2001 until his retirement in October 2017. After working as a

first responder to the September 11 terrorist attack, Mr. Figueroa developed asthma, sinus, and

respiratory problems, for which he required ongoing accommodations in the form of regular leave

to attend medical appointments. In the latter part of his tenure with the Marshals Service, from

2013 until his retirement in 2017, Mr. Figueroa was placed on two restrictions regarding his use of

leave. Despite protesting these restrictions and using internal avenues to allege that the restrictions

were both discriminatory and retaliatory, Mr. Figueroa was placed under increasing scrutiny from his

supervisors at the Marshals Service. Mr. Figueroa contends that this scrutiny reached the level of

discrimination from September 2016 until his retirement in October 2017. Finally, the Marshals

Service denied Mr. Figueroa his retirement credentials in 2018, which prohibited Mr. Figueroa from

obtaining a firearm and certain subsequent employment. In September 2021, Mr. Figueroa filed suit

against both the Marshals Service and the Attorney General (together, "Defendants") alleging both

discrimination and retaliation under several federal statutes.

Because Mr. Figueroa has failed to plead sufficient facts to plausibly establish that he was subject to disparate treatment, that he endured a hostile work environment, that his employer failed to accommodate his disability, or he was retaliated against because of a protected activity, Defendants' motion to dismiss Plaintiff's complaint is GRANTED.

## II.   BACKGROUND[1]

### A.   Mr. Figueroa's Employment as a Detention Enforcement Officer

Plaintiff began work as a Detention Enforcement Officer ("DEO") with the United States Marshals Service ("USMS") in February 2001.  Dkt. No. 15 (First Amended Complaint, or the "FAC") ¶¶ 6, 14.  He worked for the United States District Court in the Southern District of New York.  *Id.*  Mr. Figueroa's role as a DEO "was to assist with transport and housing of federal prisoners in the SDNY."  *Id.* ¶ 13.  The USMS is an agency within the Department of Justice.  *Id.* ¶ 12.

Mr. Figueroa "was one of many USMS officer first responders who assisted at the site of . . . the World Trade Center on September 11, 2001," and he continued working at the World Trade Center site "in the days and months following" the September 11 attacks.  *Id.* ¶ 7.  Because of the time he spent at the World Trade Center following September 11, Mr. Figueroa developed "disabling severe asthma and respiratory problems" as well as sinus problems.  *Id.* ¶¶ 8, 17.  Mr. Figueroa required accommodations from the USMS so he could take regular leave to attend medical appointments and receive treatment.  *Id.* ¶¶ 8, 19.

In 2010, Mr. Figueroa gave a letter from his physician to his then-supervisors.  *Id.* ¶ 21.  The letter addressed Mr. Figueroa's asthma, sinus, and respiratory problems for which he required

---

[1] The facts are drawn from Plaintiff's amended complaint.  Dkt. No. 15 ("FAC").  For this motion, the Court must accept as true the facts alleged in the amended complaint.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

intermittent leave to receive treatment and to pursue a workers' compensation benefits claim. *Id.* Mr. Figueroa alleges that sometime after he provided this letter, he was told second-hand that a supervisor had questioned the severity of his disability. *Id.* ¶ 22. Additionally, sometime between 2010 and May 2013, Mr. Figueroa was involved with Equal Employment Opportunity ("EEO") activity relating to an "administrative discrimination complaint" and he participated "in class action litigation concerning employment discrimination against DEOs based on race." *Id.* ¶ 25.

### B. 2013 to September 2016

On September 20, 2013, Mr. Figueroa's supervisor issued him a "Letter of Leave Restriction" due to his use of leave for "workers' compensation related medical appointments and for care of his infant daughter." *Id.* ¶ 23. In response, Mr. Figueroa filed an administrative complaint claiming that the letter was discriminatory because of his asthma, sinus, and respiratory disabilities and retaliatory because of his prior EEO activity and class-action participation. *Id.* ¶ 25. Sometime later—though Plaintiff does not identify when—the USMS lifted Mr. Figueroa's 2013 leave restrictions, which resolved the administrative discrimination complaint. *Id.* ¶ 26. Mr. Figueroa contends, however, that he "continued to experience escalated harassment and discrimination . . . related to his use of leave for ongoing medical treatment related to his 9/11 injuries." *Id.* ¶ 27. That harassment led Mr. Figueroa to "not make a request or try to bundle appointments on one day to avoid the harassment he[ ] would inevitably experience if he made multiple requests for leave in any given time period." *Id.*

On September 16, 2016, USMS management implemented a sign in sheet. *Id.* ¶ 115. Despite witnessing "numerous employees leave the office without signing out and/or inputting the end of their shift (4:00pm) leaving the office at 3:30 PM almost every day for months," management said nothing to them. *Id.* ¶ 117. Mr. Figueroa "was the only one being watched by management when he signed in and signed out." *Id.* ¶ 116.

### C.  September 2016 to June 2017

On September 28, 2016, Mr. Figueroa applied for disability retirement from the USMS because he did not want to experience any more harassment for taking his leave.  *Id.* ¶¶ 31, 34.  "As soon as he submitted his application," Mr. Figueroa's supervisor—Supervisory Deputy United States Marshal Stuart Smith—"began submitting complaints about minor infractions to Internal Affairs that would normally not trigger a complaint or any discipline, most of which were related to [Mr. Figueroa's] leave requests and attendance, which Smith falsely alleged that [Mr. Figueroa] was abusing."  *Id.* ¶ 143.  Mr. Figueroa believed that Smith was attempting to get him fired before he could receive his disability retirement.  *Id.* ¶ 145.  Mr. Figueroa believed, alternatively, that Smith wanted to ensure he did not retire in good standing.  *Id.*

Also on September 28, 2016, Smith issued Mr. Figueroa a second "Letter of Leave Restriction."  *Id.* ¶ 35.  That letter addressed what the USMS referred to as Mr. Figueroa's "excessive absenteeism" and "a possible abuse of leave."  Dkt. No. 19-1 (the "2016 Letter").  The letter's stated purpose was to "correct [Mr. Figueroa's] excessive absenteeism"; it was to remain in effect until Mr. Figueroa could show that he was able to consistently abide by the leave requirements (which the letter then outlined).  *Id.* at 3.  The 2016 Letter served as evidence that the USMS had spoken with Mr. Figueroa about his "leave balances and leave requesting procedures," but it noted that it was not to be placed in his official file and that it was not a disciplinary action.  *Id.* at 4.

The 2016 Letter required Mr. Figueroa to request all sick leave for "prearranged medical appointments or care of a family member" in advance while reserving the right to deny the request if the USMS needed Mr. Figueroa's services.  *Id.* at 1.  If Mr. Figueroa did not receive approval of a request and failed to show up for his shift, his supervisor could report him as "absent without approved leave (AWOL)."  *Id.*  Requests would be denied if Mr. Figueroa did not have sufficient accrued leave to cover the requested absence.  *Id.* at 1–2.  The 2016 Letter reminded Mr. Figueroa

that emergency requests should be rare and required him, when making such a request, to notify his supervisor "no later than 30 minutes prior to the start of [his] shift" and to provide "the exact nature of the emergency and how long [Mr. Figueroa] expect[ed] to be away from the office." *Id.* at 2. It also required that Mr. Figueroa provide medical documentation for emergency leave before the end of the pay period when he took the leave. *Id.* If Mr. Figueroa failed to provide this documentation, his supervisors reserved the right to mark him as AWOL for his absence. *Id.*

Finally, the 2016 Letter required Mr. Figueroa to request annual leave at least twenty-four hours in advance and noted that the request would be denied if he had not accrued sufficient annual leave to cover the absence. *Id.* Mr. Figueroa was prohibited from using leave requests to cover any tardiness, except in the case of an emergency. *Id.* at 3. Similarly, the 2016 Letter disallowed the use of leave without pay ("LWOP") except in cases of emergency or if Mr. Figueroa invoked the Family Medical Leave Act (the "FMLA"). *Id.* Mr. Figueroa also had to provide "supporting medical documentation for the request." *Id.* When Mr. Figueroa planned to use FMLA leave, he had to notify his supervisor and provide "acceptable medical documentation." *Id.*

On December 27, 2016, "the morning shift employees were allowed to go home for the day early at 1pm." FAC ¶ 126. When Mr. Figueroa called Smith to ask if he could leave, Smith told Mr. Figueroa that he had to stay until 4:00 p.m. because he was doing Union duty that day and thus was on "Union time." *Id.* ¶¶ 127–128. Around 2:25 p.m., after completing union business for the day, Mr. Figueroa received permission from Chief Saleh to leave for the day around 2:45 p.m.[2] *Id.* ¶ 130–132. Mr. Figueroa signed out at home at 4:00 p.m. like his fellow shift-members. *Id.* ¶ 133. Two days later, on December 29, 2016, Smith told Mr. Figueroa that he would be charged as AWOL from 2:45–4:00 p.m. and that Smith had reported Mr. Figueroa to Internal Affairs. *Id.* ¶ 134.

---

[2] Plaintiff's complaint does not explain who "Chief Saleh" is, but the Court understands that person to be another supervisor.

In "early 2017," Mr. Figueroa filed a formal administrative complaint with the Department of Justice regarding "discrimination and retaliation." *Id.* ¶ 47. Because "[t]he unlawful conduct continued," Mr. Figueroa "had to amend his administrative complaint . . . several times." *Id.* ¶ 48. On March 29, 2017, an arbitrator heard Mr. Figueroa's complaint alleging that the USMS "committed an unwarranted and unjustified action . . . by issuing the [2016] Restriction Letter." Dkt. 19-3 ("Arb. Op.") at 11. At that hearing, the USMS argued that it was authorized in issuing the 2016 Letter because of Mr. Figueroa's "pattern of calling in sick the day of his assigned shift" and because he was "routinely late without following the call in requirements or calling his supervisor as he was instructed." *Id.* at 12. On June 28, 2017, the arbitrator found that Mr. Figueroa's "excessive and abusive use of leave justified the [USMS's] issuance of the [2016] Restriction Letter." *Id.*

Meanwhile, however, Mr. Figueroa alleges that he was continuously harassed by his supervisors. FAC ¶ 48. For instance, on January 17, 2017, Smith questioned Mr. Figueroa about his request to use eight hours of sick leave to go to a doctor's appointment. *Id.* ¶¶ 49–50. When Mr. Figueroa informed Smith that he had made a mistake in the request and intended to use four hours of sick leave and four hours of LWOP, Smith told Mr. Figueroa he could only use four hours of LWOP and was required to report to work for four hours prior to the doctor's appointment. *Id.* ¶¶ 51–53. When Mr. Figueroa walked away from Smith, thinking the conversation was over, Smith called him back over and "scolded [Mr. Figueroa]" and "yelled at [Mr. Figueroa]" not to walk away when Smith was speaking to him. *Id.* ¶¶ 55–57. Smith also made a disparaging comment about Mr. Figueroa's desire to be included in a memorial for victims of the 9/11 terrorist attacks. *Id.* ¶ 60. Mr. Figueroa also notes an incident on January 12, 2017, when he was denied a sick leave request for a dentist appointment because he had not accrued enough leave by that date. *Id.* ¶ 64. Mr. Figueroa had to request the leave again once he had accrued enough sick leave. *Id.* ¶ 66.

On March 20, 2017, after Mr. Figueroa requested leave for "Union time" later that day,
Smith walked closely by Mr. Figueroa's cubicle and said "in a menacing tone" that that was "not
how you're going to get your Union Time approved.  You need to up your level of professionalism."
*Id.* ¶¶ 74, 76.  Four days later, "SDUSM denied [Mr. Figueroa's] leave request stating that he did not
have sufficient leave for the request."  *Id.* ¶ 78.  But Mr. Figueroa did have enough leave for the
request, and he had to convince Smith for "more than a half hour" that he had enough leave balance
for his request; Smith eventually relented and agreed that Mr. Figueroa did have sufficient leave.  *Id.*
¶ 81.  Based on Smith's "tone and demeanor[,]" he seemed to regard this instance as
"unprofessional."  *Id.* ¶ 82.

### D.  July 2017 to October 2017

Four months later, on July 27, 2017, Mr. Figueroa was running late for work because he was
stuck behind a garbage truck; he called the supervisor on duty to "advise him of this predicament."
*Id.* ¶ 83–84.  Mr. Figueroa arrived to work at 7:40 a.m., signed in, and told Smith he would report for
duty once he changed into his uniform.  *Id.* ¶ 85–86.  "DEOs . . . are allowed a 10 minute 'doffing
and donning' period once they arrive for their shift to change," but Smith chastised Mr. Figueroa
"loudly and told him that he had signed [Mr. Figueroa] in at 7:51am."  *Id.* ¶ 87–88.  According to
Mr. Figueroa, Smith "did not similarly admonish any other DEOs in the same manner or mark them
in late[ ] . . . [i]n fact, Smith frequently turned a blind eye to other DEOs who changed after the start
of their shift, even when they arrived late."  *Id.* ¶ 90.

On Saturday, August 5, 2017, Smith emailed Mr. Figueroa asking for medical documentation
to support upcoming leave requests.  *Id.* ¶ 91.  Smith said he would deny the requests without the
documentation that he requested.  *Id.* ¶ 94.  "Smith continued to make these requests for many of
[Mr. Figueroa's] regular sick leave requests."  *Id.* ¶ 95.  On September 1, 2017, everyone working the
"early shift" was allowed to leave work at 1:00 p.m. and "claim time worked up to 4pm," while Mr.

Figueroa "was not told he could leave early . . . [and] stayed in the office until the end of his shift at 4pm." *Id.* ¶ 118.

### E.  Mr. Figueroa's 2017 Retirement and the 2018 Denial of Post-Retirement Credentials

When the USMS officially granted Mr. Figueroa his disability retirement effective on October 28, 2017, the 2016 Letter restrictions were still in effect. *Id.* ¶ 110.  Smith had included both the 2013 Letter and the 2016 Letter, along with email counseling and a 2012 email outlining "performance concerns," in Mr. Figueroa's retirement application. *Id.* ¶ 98.  Mr. Figueroa asserts that because the 2013 and 2016 letters stated they were not to be made part of Mr. Figueroa's official record, Smith should not have included them with Mr. Figueroa's retirement application package. *Id.* ¶ 99.

On October 17, 2017, Mr. Figueroa applied to Chief Peter McCauley for his post-retirement credentials. *Id.* ¶ 136.  These credentials, if granted, would indicate that Mr. Figueroa left the USMS in good standing and would allow him to carry a firearm after retirement. *Id.* ¶ 101.  But on January 28, 2018, Mr. Figueroa received a denial of his request for post-retirement credentials because of "substantial allegations of misconduct against you at the time of your separation, which were significant enough that granting credentials is not in the best interest of the USMS." *Id.* ¶ 137.  Mr. Figueroa requested that the decision be reconsidered because he believed that denying him retirement credentials was retaliation for his still-pending discrimination complaint. *Id.* ¶ 139; *see id.* ¶ 47 (describing that complaint).  In response to his request for reconsideration, the USMS informed him, on February 8, 2018, that work records showed there were open allegations against him upon retirement and that it had "become known that you have had negative contact with law enforcement post retirement." *Id.* ¶ 140.  According to Mr. Figueroa, neither of these allegations were true. *Id.* ¶ 141.  Additionally, "nothing ever happened with" Smith's complaints to internal affairs and "none were ever deemed founded." *Id.* ¶ 144.  Internal Affairs reviewed Mr. Figueroa's actions twice, but

he "never received a disposition nor was he ever brought up on charges or otherwise disciplined." *Id.* ¶ 146.

Mr. Figueroa alleges that Smith either knew or should have known that including the 2013 and 2016 letters would result in the USMS denying Mr. Figueroa's request for post-retirement credentials and that by those means Smith sabotaged his attempt to obtain those credentials. *Id.* ¶ 101. Without them, Mr. Figueroa asserts, he cannot possess or carry a firearm, which limits his employment opportunities to jobs that do not require him to be able to possess a firearm. *Id.* ¶ 148. Similarly, Mr. Figueroa asserts that he cannot obtain a license to carry a firearm as a private citizen because he does not have retirement credentials from the USMS. *Id.* ¶ 153.[3]

## III.   PROCEDURAL HISTORY

Mr. Figueroa commenced this lawsuit on September 20, 2021. Dkt. No. 1. He filed his First Amended Complaint, the operative complaint in this case, on April 8, 2022. Dkt. No. 15. The FAC brings five causes of action.[4] Four—disparate treatment, hostile work environment, failure to accommodate, and retaliation—are brought under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et*

---

[3] Mr. Figueroa's complaint was first framed before the Supreme Court's ruling in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which has significantly altered the contours of Second Amendment jurisprudence generally and in New York in particular. While *Bruen* may (or may not) alter Mr. Figueroa's ability to obtain a license to carry a firearm as a private citizen in the absence of his USMS retirement credentials, it does not change any conclusions reached by the Court in this case.

[4] The FAC only lists three causes of action: "Disability Discrimination Pursuant to the Rehabilitation Act," "Retaliation Pursuant to the Rehabilitation Act," and "Retaliation Pursuant to Title VII." *See* FAC ¶¶ 156–165. But a plaintiff may base a Rehabilitation Act discrimination claim on one of four theories of liability: disparate treatment, disparate impact, failure to make reasonable accommodation, or hostile work environment. *See Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (listing disparate treatment, disparate impact, and failure to make reasonable accommodation as bases for an ADA or Rehabilitation Act claim); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 69 (2d Cir. 2019) (holding that hostile work environment claims are cognizable under the ADA); 29 U.S.C. § 794(d) (explaining that the standards for a violation of the Rehabilitation Act are the same as those for the ADA); *Leftridge v. N.Y.C. Dep't of Educ.*, No. 17-cv-7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) ("The standard for demonstrating a hostile work environment is the same under Title VII, the ADA, [and] the Rehabilitation Act."). Here, the parties agree that the FAC pleads a Rehabilitation Act discrimination claim under the disparate treatment and hostile work environment theories. *See* Defs' Mem. at 12 n.7 (arguing that Plaintiff's complaint was based on "disparate treatment" and "hostile work environment" theories); Pl's Opp. at 9–12 (agreeing that these are two of the theories on which Plaintiff's discrimination claim is based). Plaintiff also argues that he brings his Rehabilitation Act discrimination claim under a failure-to-accommodate theory, *see* Pl's Opp. at 12–13, and the Court agrees. *See* FAC ¶ 157 (alleging a failure to accommodate Plaintiff's disability). So the Court analyzes the FAC as advancing three Rehabilitation Act discrimination-based causes of action, and—with the Rehabilitation Act and Title VII retaliation claims added—five causes of action in total.

*seq. See* FAC ¶¶ 156–162.  And one—an additional retaliation claim—is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  *See* FAC ¶¶ 163–165.

On April 26, 2022, Defendants moved to dismiss the FAC, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief could be granted.  Dkt. No. 17 (motion); Dkt. No. 18 (accompanying memorandum, or "Defs' Mem.").  Mr. Figueroa opposed Defendants' motion on June 24, 2022.  Dkt. No. 27 ("Pl's Opp.").  Defendants replied on July 8, 2022.  Dkt. No. 28 ("Reply").

## IV.   LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And "[t]he tenet that a court must accept" as true a complaint's factual allegations does not apply "to legal conclusions."  *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim.  *Twombly*, 550 U.S. at 570.  A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully.  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  The plaintiff's claim must be more than merely "speculative."  *Twombly*, 550 U.S. at

545.  And a reviewing court must "draw on its judicial experience and common sense" to determine

plausibility.  *Iqbal*, 556 U.S. at 679 (citation omitted).

### B.  Consideration of Documents Outside of the FAC

On a motion to dismiss, a court must generally "limit itself to the facts stated in the

complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  But a court may

consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated

in it by reference."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P.

10(c) (other citations omitted)).  A court may also consider a document relied on by the plaintiff if it

"is integral to the complaint."  *Id.* (quotation and brackets omitted).  A document is "integral to the

complaint" if the complaint "relies heavily" on the document's "terms and effect."  *Nicosia v.

Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305

n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC"

on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint"

(quotation and brackets omitted)).  A plaintiff must "*rely* on the terms and effect of the document in

drafting the complaint; mere notice or possession is not enough."  *Nicosia*, 834 F.3d at 231

(emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir.

2006)).

In addition to documents incorporated by reference or those integral to the complaint, the

Court may also consider "matters of which judicial notice may be taken."  *Goel v. Bunge, Ltd.*, 820

F.3d 554, 559 (2d Cir. 2016) (citation omitted).  "Courts may take judicial notice *sua sponte* . . . of

facts that are 'not subject to reasonable dispute' because it 'is generally known within the trial court's

territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy

cannot be questioned.'"  *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 48 n.15

(S.D.N.Y. 2022) (quoting Fed. R. Evid. 201(b)); *see also* Fed R. Evid. 201(c)(1) ("The court may take

judicial notice on its own."). "[C]ourts have regularly taken judicial notice of arbitration awards and collective bargaining agreements in considering a motion to dismiss." *Cox v. Perfect Building Maintenance Corp.*, 16-cv-7474, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017).

Based on these standards, the Court has considered three documents outside of the FAC in resolving Defendants' motion to dismiss: (1) the 2016 Letter of Leave Restriction, (2) the United States Marshals Service Leave Administration Policy, and (3) the 2017 Arbitration Opinion. *See* Dkt. No. 19 Exs. 1–3. First, the Court has considered the 2016 Letter of Leave Restriction, Dkt. No. 19-1, because the 2016 Letter is integral to the FAC; the document repeatedly relies on its terms and effects. *See, e.g.*, FAC ¶¶ 35–38, 42, 65, 75. Second, the Court has also considered the United States Marshals Service Leave Administration Policy as integral to Plaintiff's complaint, *see* Dkt. No. 19-2 (the "USMS Policy"), because Mr. Figueroa argues that certain restrictions placed on him were inconsistent with the USMS Policy—an argument that relies on the terms of the USMS Policy. *See* FAC ¶ 41. Finally, the Court takes judicial notice of the 2017 Arbitration Opinion to determine what statements it contains. Dkt. No. 19-3 ("Arb. Op."); *see Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) ("In the motion to dismiss context . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted [in the documents].'" (first two alterations in original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). There is no dispute about what statements the 2017 Arbitration Opinion contained. And Mr. Figueroa "does not contest the use of documents referred to in the FAC, included with the Defendants' motion, to evaluate the FAC." Pl's Opp. at 6. As such, the Court may consider what the Arbitration Opinion stated.

## V.    DISCUSSION

Defendants seek to bar Mr. Figueroa, under the doctrine of collateral estoppel, from relitigating the "specific issue of fact" of the "motivation underlying, and the propriety of, the 2016

Letter and its terms," which Defendants argue was "fully litigated in the 2017 arbitration."  Defs'

Mem. at 10.  Defendants then seek, regardless of the Court's view on the collateral-estoppel issue, to

dismiss all of Plaintiff's claims.  *Id.* at 11–25.

For the reasons set forth below, the Court will not give preclusive effect to the 2017

Arbitration Opinion concerning the meaning of the 2016 Letter.  But because Plaintiff has failed to

state Rehabilitation Act disparate treatment, hostile work environment, failure to accommodate, and

retaliation claims, and has also failed to state a retaliation claim under Title VII, all of his claims will

be dismissed.

## A.  Legal Standards

### i.  Collateral Estoppel

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a

subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding."

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  "Under federal law, collateral

estoppel applies when '(1) the identical issue was raised in a previous proceeding; (2) the issue was

actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity

to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final

judgment on the merits.'"  *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2002) (quoting *Interoceanica Corp.

v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).

Findings made in arbitration pursuant to a "collective-bargaining agreement [that does] not

cover statutory claims," however, are not preclusive in later federal-court proceedings for relief

under antidiscrimination statutes.  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 262 (2009); *see Alexander

v. Gardner-Denver Co.*, 415 U.S. 36, 59–60 (1974) (holding that an arbitrator's findings could not have

preclusive effect in a later action brought under Title VII); *McDonald v. City of West Branch*, 466 U.S.

284, 292 (1984) ("We therefore hold that in a [42 U.S.C.] § 1983 action, a federal court should not

afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement.").  As the Supreme Court has explained, that is because the "contractual right to submit a claim to arbitration" and the "statutory right against discrimination" have "legally independent origins."  *Gardner-Denver*, 415 U.S. at 52.  The arbitrator's "source of authority" is the "collective-bargaining agreement"; she may only "interpret and apply that agreement in accordance with the industrial common law of the shop."  *Id.* at 53 (internal quotation marks omitted).  "The arbitrator, however, has no general authority to invoke public laws that conflict with the bargain between the parties," and her decisions therefore have no effect on the "substantive rights" protected by antidiscrimination statutes.  *Id.* at 53–54; *see Penn Plaza*, 556 U.S. at 262 (affirming *Gardner-Denver*'s distinction between arbitral decisions and statutory claims where the collective-bargaining agreement does not cover statutory claims).[5]

## ii.  Disparate Treatment Claim[6]

To state a claim for discrimination under the ADA or the Rehabilitation Act, "a plaintiff must allege: '1) that she was qualified for the job at the time of an adverse employment action; 2) that she was subjected to adverse employment action; 3) that she was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under

---

[5] The Court is not aware of a case in this circuit examining the relationship between an arbitrator's findings and a later Rehabilitation Act (as opposed to Title VII) claim.  But courts of appeal have applied the rule that prior arbitration cannot be given preclusive effect in subsequent antidiscrimination suits to other statutes that, like Title VII, effectuate the "federal policy against discriminatory employment practices."  *Gardner-Denver*, 415 U.S. at 59; *see Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 547–49 (6th Cir. 2008) (no preclusion in case involving Americans with Disabilities Act); *Johnson v. Univ. of Wisconsin-Milwaukee*, 783 F.2d 59, 62 (7th Cir. 1986) (no preclusion in case involving the Age Discrimination in Employment Act).  Neither party, moreover, has argued that this rule does not apply to the Rehabilitation Act.  The Court accordingly concludes that "[a]gency decisions on discrimination claims alleged by federal employees and arbitration decisions resolving claims under nondiscrimination provisions of a collective bargaining agreement are neither entitled to preclusive effect or binding on federal courts in subsequent civil actions filed under Title VII *or* the Rehab Act."  *Mitchell v. Postmaster Gen.*, No. 3:18-cv-1000, 2020 WL 2312047, at *15 (D. Or. 2020) (emphasis added).

[6] A disparate treatment claim under the ADA or Rehabilitation Act is synonymous with a standard claim for intentional discrimination.  *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021); *see* 29 U.S.C. § 794(d) (incorporating the standards for violating the ADA into the Rehabilitation Act).  Because the parties refer to this cause of action simply as a disparate treatment claim, the Court does so also.  *See* Defs' Mem. at 12, Pl's Opp. at 9.

circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.'" *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467–68 (2d Cir. 2019) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016)); *see also* 29 U.S.C. § 794(d) (incorporating the ADA's standards into the Rehabilitation Act).

"An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71–72 (2d Cir. 2019) (quoting *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002)).  "Harsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment." *Id.* at 72.

Finally, the Second Circuit has clarified that "when a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA." *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019); *see also Kelleher*, 939 F.3d at 468 (noting that a plaintiff under the ADA must allege "that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision").

### iii.   Hostile Work Environment Claim

The standard for pleading a hostile work environment claim under the Rehabilitation Act is the same as the standard under the ADA and Title VII.  *See Fox*, 918 F.3d at 74 (adopting Title VII's standard as the ADA standard); 29 U.S.C. § 794(d) (incorporating the standards for violating the ADA into the Rehabilitation Act); *Leftridge v. N.Y.C. Dep't of Educ.*, No. 17-cv-7027, 2020 WL

1503665, at *11 (S.D.N.Y. Mar. 30, 2020) ("The standard for demonstrating a hostile work environment is the same under Title VII, the ADA, [and] the Rehabilitation Act.").  Under any of those laws, to allege a hostile work environment, a plaintiff must plausibly plead that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "This standard has both objective and subjective components:  the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (quotation omitted).

"In determining whether a plaintiff suffered a hostile work environment," a court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).  "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

"[T]he plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (citation omitted).  As a hostile work environment claim is a type of discrimination claim under the Rehabilitation Act, a plaintiff must therefore plausibly plead that the hostile work environment occurred under circumstances raising a reasonable inference that his disability was a determining factor in the creation of the hostile work environment.  *See Kelleher*, 939 F.3d at 468.

### iv.   Failure to Accommodate Claim

To state a claim "of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act," a plaintiff must plausibly allege that "'(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Natofsky*, 921 F.3d at 352 (alterations in original) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

"In reviewing a reasonable accommodation claim," a court must "ask whether a plaintiff with disabilities as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Wright v. N.Y.S. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)). "In conducting this 'fact-specific' review for reasonableness, we keep in mind that the 'hallmark of a reasonable accommodation is effectiveness,' and that 'a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective.'" *Id.* (quoting *Wright*, 831 F.3d at 72).

Under the ADA and the Rehabilitation Act, reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); *see* 29 U.S.C. § 794(d) (incorporating the ADA's standards into the Rehabilitation Act). "Of course, [a] reasonable accommodation can never involve the elimination of an essential function of a job." *McMillan v. City*

17

*of New York*, 711 F.3d 120, 127 (2d Cir. 2013) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).

### v.   Retaliation Claims

"[T]he elements of a retaliation claim under either [the Rehabilitation Act] or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (alterations in original) (quoting *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002)).  The same elements are required under Title VII.  *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

With respect to an adverse employment action, a plaintiff must plead "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "We speak of *material* adversity because we believe it is important to separate significant from trivial harms."  *Id.* (emphasis in original).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.*  That said, "[t]his definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII [or the Rehabilitation Act]: 'The antiretaliation provision, unlike the substantive discrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington*, 548 U.S. at 64) (brackets omitted).

For the final element, causation, a plaintiff must allege facts suggesting that "the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 91 (quotation omitted).  Nonetheless, a causal connection in retaliation claims can be pleaded either "(1) indirectly, by [pleading] that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

### B.  Application

#### i.  Collateral Estoppel

The Court will not give preclusive effect to any findings made in the 2017 Arbitration Opinion.  Arbitration proceedings pursuant to a collective-bargaining agreement are not binding on later federal-court proceedings under antidiscrimination statutes, unless the collective-bargaining agreement itself covers statutory claims.  *See Penn Plaza*, 556 U.S. at 262; *Gardner-Denver*, 415 U.S. at 59–60.  Here, there is no indication that the collective-bargaining agreement under which the 2017 Arbitration Opinion was decided covered statutory claims.  To the contrary, the Arbitration Opinion states that the stipulated issue to be resolved in that proceeding was whether the 2016 Letter violated a provision of the collective-bargaining agreement.  Arb. Op. at 8.  And the arbitrator resolved exactly that issue:  She determined that the USMS "did not violate [the collective-bargaining agreement] when it issued a Leave Restriction Letter to [Mr. Figueroa] on September 28, 2016."  *Id.* at 16.  In other words, the arbitration did *not* address, let alone resolve, any statutory claims that Mr. Figueroa now raises in federal court.

Nor could the arbitrator have done so, absent any provision in the collective-bargaining agreement allowing her to adjudicate statutory claims.  An arbitrator's "source of authority" is the

"collective-bargaining agreement."  *Gardner-Denver*, 415 U.S. at 53; *see also Barrantine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 744 (1981) (because an "arbitrator's power is both derived from, and limited by, the collective-bargaining agreement," her "task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties.").  So if that agreement "expressly covers both statutory and contractual discrimination claims," an arbitrator can resolve statutory discrimination claims—and that resolution can have preclusive effect in federal court.  *See Penn Plaza*, 556 U.S. at 264.  But if not, her authority is limited to interpreting the "industrial common law of the shop":  Whether a given action by an employer violated the terms of a collective-bargaining agreement.  *Gardner-Denver*, 415 U.S. at 53.  And any decisions made related to that authority have no preclusive effect on a later federal-court statutory proceeding.  *Id.* at 59–60.

Defendants argue that while arbitration decisions cannot preclude litigation of a later antidiscrimination *claim* in federal court, findings made by an arbitrator can preclude certain *issues* from being relitigated in subsequent proceedings.  *See* Reply at 2.  That view is both wrong and, in this case, irrelevant.  It is wrong because both the Supreme Court and Second Circuit have declined, in analyzing whether an arbitrator's decisions have preclusive effect in subsequent federal-court antidiscrimination suits, to distinguish between claim and issue preclusion.  *See Gardner-Denver*, 415 U.S. at 49 n.10 ("The policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are equally applicable to the doctrines of res judicata *and collateral estoppel*.") (emphasis added); *Penn Plaza*, 556 U.S. at 262 (quoting *Gardner-Denver*'s language considering "res judicata and collateral estoppel" together); *Siddiqua v. N.Y. State Dep't of Health*, 642 F. App'x 68, 71 n.2 (2d Cir. 2016) (summary order) ("*Gardner-Denver* does not apply only to claim preclusion.  It also prohibits a court from dismissing . . . claims by giving preclusive effect to findings of fact made by

the Arbitrator.").[7]   It is irrelevant here because the only issue "actually litigated and decided in the

previous proceeding"—as necessary to invoke collateral estoppel, *see Purdy*, 337 F. 3d at 258—was

that the 2016 Letter complied with the applicable collective-bargaining agreement.  *See* Arb. Op. at 8,

16.  So even if that finding were given preclusive effect, it would have no bearing on the resolution

of Plaintiff's statutory claims, which turn not on the USMS's compliance with the collective-

bargaining agreement but on whether Plaintiff was subject to discrimination or retaliation.

Defendants' final response points to the Civil Service Reform Act (the "CSRA").  Reply at 3.

Defendants note that, because Plaintiff was a federal employee covered by a collective-bargaining

agreement, he could address "the matter" of his grievance through arbitration, or through a statutory

procedure, "but not both." 5 U.S.C. § 7121(d).  And they further argue that courts have construed

"matter" broadly to encompass more than a "legal theory:  it refers to the factual basis of the

employee's adverse action."  *Heimrich v. Dep't of the Army*, 947 F.3d 574, 580 (9th Cir. 2020).

All of that is true, but it does not operate to preclude any portion of Plaintiff's claim here.

The "matter" of a discrimination claim is only litigated in arbitration, such that it may not be

relitigated through a statutory case, if the plaintiff can and does submit his discrimination claims to

arbitration.  *See id.* at 576, 580–81.  In *Heimrich*, for instance, the plaintiff "cited violations of the

Americans with Disability Act, as well as [a provision of the collective-bargaining agreement], which

prohibit[ed] 'discrimination on the basis of race, color, religion, sex, national origin, age, mental or

physical disabilities, and reprisal'" *in his initial arbitration grievance. Id.* at 576.  He was therefore

precluded from relitigating his discrimination-based wrongful termination claims in a subsequent

statutory action, regardless of the legal theory they were based on.  *Id.* at 580–81.  But here, there is

---

[7] Plaintiff argues that *Benjamin v. Traffic Executive Association Eastern Railroads*, 869 F.2d 107 (2d Cir. 1989) stands for the proposition that an arbitration proceeding can have preclusive effect in later federal-court actions.  *See* Reply at 2 n.2. But that decision neither dealt with antidiscrimination statutes nor with arbitration pursuant to a collective-bargaining agreement, and is thus inapposite here.  *See Benjamin*, 869 F.2d at 109.

no indication that Mr. Figueroa did (or could have) submitted any discrimination or retaliation-based issues to the arbitrator or that the collective-bargaining agreement covered any such issues. And the Arbitration Opinion itself plainly did not address any issues of discrimination or retaliation. *See* Arb. Op. at 8, 16. As a result, the "factual basis" of Mr. Figueroa's pleaded "adverse action[s]" in the FAC—whether he was discriminated against or retaliated against based on a protected trait—has not been litigated in any forum other than this one. In short, there is no reason to find that the 2017 Arbitration Opinion, which focused solely on the 2016 Letter's compliance with a collective-bargaining agreement, has any preclusive effect over the issues raised in this proceeding.

### ii.  Mr. Figueroa's Claims

Mr. Figueroa's complaint contains four claims under section 501 of the Rehabilitation Act of 1973, *as amended* 29 U.S.C. § 791, and one claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. Because he has failed to state any as a plausible claim, they will all be dismissed.

> *1.  Mr. Figueroa Has Failed Raise an Inference That He Suffered any Adverse Action Based on His Disability.*

Because Mr. Figueroa's disparate treatment claim has not raised a reasonable inference that his employer took an adverse employment action against him because of his disability, it will be dismissed. To state a disparate treatment claim under the Rehabilitation Act, a plaintiff must allege—among other things—that he was subjected to an adverse employment action, and that the adverse employment action occurred under circumstances raising a reasonable inference that his disability was a determining factor in his employer's decision to take the adverse action. *Kelleher*, 939 F.3d at 467–68. While Plaintiff here appears to have pleaded one adverse employment action, he has not raised a reasonable inference that this action was connected to his disability.

Most of Plaintiff's allegations about events at his work that displeased him do not constitute adverse employment actions.[8]  "An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71–72 (2d Cir. 2019).  Plaintiff takes issue with the 2016 Letter and additional restrictions imposed by Smith, all of which constituted rules governing Plaintiff's use of leave.  *See* FAC 41, Dkt. No. 19-1.  And he makes other allegations—including that he was denied leave when he did not have enough accrued, FAC ¶¶ 63–66, and that he had to use a sign-in sheet, FAC ¶¶ 115–117—that quarrel with the scrutiny applied to his use of leave.  But requiring documentation and notice before using leave and watching to ensure that an employee does not take leave excessively do not constitute adverse employment actions.  *See, e.g.*, *Gentile v. Potter*, 509 F. Supp. 2d 221, 240–41 (E.D.N.Y. 2007) ("Requiring an employee to provide medical documentation is not a materially adverse action."); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) ("Many of the actions complained of by plaintiff, such as scrutiny from his supervisors that he deemed excessive, requiring documentation for sick leave, scrutiny of his wife's sick leave, the unexplained absence of certain documents that he thinks should be in his employment file, or threatening to investigate medical fraud, do not constitute adverse employment actions." (internal quotation omitted)); *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 429 (E.D.N.Y. 2014) (collecting cases to this effect).

---

[8] Defendants contend that, because Plaintiff's opposition to the motion to dismiss cites only the 2016 Letter as an adverse employment action sufficient to state a disparate treatment claim, Plaintiff has abandoned his argument on this claim apart from the issuance of that letter.  Reply at 4, *see* Pl's Opp. at 9–10.  That is a reasonable argument, as the failure to "oppose specific arguments in a motion to dismiss" can "result[ ] in waiver of those issues." *Arista Recs., LLC v. Tkach*, 122 F. Supp. 3d 32, 39 (S.D.N.Y. 2015) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F Supp. 2d 131, 152 (D. Me. 2006)).  Because the Court concludes that Plaintiff's FAC in its entirety fails to state a disparate treatment claim, however, it does not rely on abandonment as a ground for dismissal.

Nor do Plaintiff's accusations that Smith "scolded" and "yelled at" him for walking away during a conversation, FAC ¶ 55–57, or that Smith told him "in a menacing tone" that he needed to "up [his] level of professionalism," FAC ¶ 76, absent any evidence that additional action was taken against Plaintiff, constitute an adverse employment action. *See Fox*, 918 F.3d at 72 ("Harsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment."). And while Plaintiff argues that Smith "repeatedly referred complaints of leave 'abuse' and reports of AWOL against Plaintiff to the Office of the Inspector General in an attempt to have Plaintiff unfairly disciplined for his continued use of leave," he does not state that any discipline—or other adverse action—was ever taken as a result. FAC ¶ 46; *see also* FAC ¶¶ 126–134.

Plaintiff, however, has pleaded that, in one instance, he was denied four hours of sick leave to which he was entitled. FAC ¶¶ 49–53 (Plaintiff alleging that he attempted to request four hours of sick leave and four hours of leave without pay to travel to and attend a medical appointment, but that Smith required him to use only four hours of leave without pay). This is at least arguably an adverse action because it constituted a "material"—if admittedly minor—"loss of benefits." *Fox*, 918 F.3d at 71; *see Cotterell*, 64 F. Supp. 3d at 430 (noting that if a plaintiff is "prevented from using his sick leave," that "may constitute an adverse employment action"). But according to the FAC, Plaintiff's request for sick leave was denied after he had erroneously requested too much leave, and only attempted to correct his request less than twenty-four hours before taking leave. *See* FAC ¶ 49–51. The only reasonable inference that can be drawn from this sequence of events is that Plaintiff's leave was denied because of the (improper and belated) way in which it was requested. Put in terms of the Rehabilitation Act's requirements, Plaintiff has certainly not raised any reasonable inference that his disability was a determinative factor in the partial denial of leave. *See Kelleher*, 939 F.3d at

467–68.  Accordingly, Plaintiff has failed to state a disparate treatment claim under the Rehabilitation Act.

      2.  *Mr. Figueroa Has Failed to Plead That His Disability Led to a Hostile Workplace Environment.*

Plaintiff has also failed to plead a Rehabilitation Act hostile work environment claim.  To state a hostile work environment claim, a plaintiff must plausibly plead that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris*, 510 U.S. at 21).  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Id.* at 321.  And finally, a plaintiff must plausibly plead "that the hostile conduct occurred because of a protected characteristic."  *Tolbert*, 790 F.3d at 439 (2d Cir. 2015).

Here, Mr. Figueroa alleges that:  (1) he was subjected to conditions, by the 2016 Letter and Smith, that required advance notice and approval for leave, (2) he was initially denied leave for a dentist appointment when he did not have enough leave banked at the time of the request, (3) he was required to take four hours of leave without pay, as opposed to four hours of leave without pay and four hours of sick leave, for a January 18, 2017 medical appointment, (4) in several instances, Smith spoke to Mr. Figueroa in a "menacing tone" or taking issue with Mr. Figueroa's professionalism, including by telling Mr. Figueroa he needed to "up his professionalism" when Mr. Figueroa requested leave for Union activity on the day he needed the leave, (5) in several instances, Smith enforced work hours when, Plaintiff alleges, other employees were provided different treatment, (6) he was twice reported for misconduct, and (7) on two occasions, supervisors made comments questioning the severity of Plaintiff's disability or Plaintiff's characterization of his disability.  *See* FAC ¶¶ 22, 41, 46, 50–58, 60, 62–64, 68–69, 76, 82, 130–135; Dkt. No. 19-1.

These allegations fail to state a hostile work environment claim for two reasons.  First, Plaintiff has failed to connect most of these incidents to his disability.  *See Tolbert*, 790 F.3d at 439. To the contrary, the facts in the FAC and other documents suggest most of the actions that the actions Plaintiff complains of—all but category (7) in the paragraph above—were taken because Smith and others were skeptical that Plaintiff was properly using his leave.  *See, e.g.*, Dkt. No. 19-1 at 1 (stating that the 2016 Letter was issued "to address . . . excessive absenteeism"); FAC ¶¶ 50–51 (noting that Plaintiff's leave request was denied after he improperly requested too much leave initially and tried to belatedly change it); *id.* ¶ 128 (noting that Smith refused to sign Mr. Figueroa out early because, in Smith's view, Plaintiff was on "Union Time" until 4:00 p.m.); *id.* ¶¶ 46, 55, 76, 134 (noting that Plaintiff was reprimanded because he walked away from his supervisor and because of supposed lack of professionalism and that he was twice reported for misconduct for supposed abuse of leave).  And any incidents that did not occur because of Plaintiff's disability cannot form the foundation of his hostile work environment claim.  *Tolbert*, 790 F.3d at 439.

Plaintiff does recount two comments connected to his disability.  *See* FAC ¶ 22 (noting that, after he requested leave, he was informed that a supervisor who was also a first responder questioned the necessity of Plaintiff's leave by stating:  "I was there [on 9/11], and nothing happened to me"); *id.* ¶ 60 (noting that Smith mocked Plaintiff for wanting to be included in a memorial for 9/11 victims).  But these incidents do not represent "discriminatory intimidation, ridicule, [or] insult" so "severe or pervasive" as to "alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn*, 795 F.3d at 320–21; *see Garcia v. NYC Health & Hosps. Corp.*, No. 19-cv-997, 2019 WL 6878729, at *7 (S.D.N.Y. Dec. 17, 2019) (concluding that an incident where the plaintiff was publicly questioned about his disability by his supervisor did not constitute a hostile work environment even where coupled with four incidents where his supervisor yelled at or was aggressive towards him and an incident where the plaintiff believed his supervisor

referred to him as a "f*****" in another language" (asterisks added)).  The first did not occur in front of Plaintiff but was reported to him later; and the second did not question Plaintiff's disability but rather Plaintiff's comparison of his disabled status to those who died in the 9/11 attacks.  FAC ¶¶ 22, 60.  And in any event, Plaintiff does not state that any leave was ever denied, any adverse action was ever taken, or that his work performance was affected because of these two comments over seven years.  *See Littlejohn*, 795 F.3d at 321 ("The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").  Plaintiff's pleading thus falls far short of other cases in which a hostile work environment has been established.  *See, e.g., LeGrand v. WalMart Stores E., LP*, 779 F. App'x 779, 781 (2d Cir. July 11, 2019) (holding that the plaintiff plausibly alleged a hostile work environment where her supervisor called her "r*******," disclosed her disability to others and referred to her using racial epithets among other employees (asterisks added)), *Fox*, 918 F.3d at 75–76 (finding a hostile work environment claim survived summary judgment where the plaintiff introduced evidence that his employer ignored months of taunting comments and actions from co-workers related to the plaintiff's Tourette's Syndrome).  Accordingly, Mr. Figueroa's hostile work environment claim is dismissed.

### 3. Mr. Figueroa Has Failed to Plead That His Employer Denied Any Reasonable Accommodation for his Disability.

Mr. Figueroa has also failed to plausibly allege that his employer failed to accommodate his disability.  An employee making a reasonable accommodations claim under the Rehabilitation Act must allege, among other things, that his employer has refused to make reasonable accommodations for his disability.  *Natofsky*, 921 F.3d at 352.

Here, Mr. Figueroa has stated that, because of his medical conditions, he "required continued reasonable accommodation . . . in the form of leave for ongoing medical treatment."  *Id.* ¶ 19.  But he has not alleged that he ever requested or was denied additional leave, because of his disability, as compared to others, or that he was ever unable to attend a medical appointment.  *See*

*generally* FAC.  Instead, Plaintiff's reasonable accommodations claim centers on conditions imposed

on his use of leave, including requirements that he request leave in advance and provide

documentation for his use of medical leave.  *See, e.g.*, Pl's Opp. at 12; FAC ¶¶ 41, 49–53, 91.

Mr. Figueroa's disability, however, was entirely unrelated to both these restrictions and his

ability to comply with them.  He has not alleged, for example, that his medical conditions arose so

suddenly that requesting leave in advance would be impracticable.  Put differently, Mr. Figueroa's

request that he not be subject to documentation and timing requirements to request leave was not a

request for an "accommodation" for his disability; instead, it was a straightforward workplace

dispute.  *See* Dkt. No. 19-3 (the 2017 Arbitration Opinion, which treated the leave conditions as a

workplace dispute).  And because the one time that Plaintiff was in fact denied leave resulted from

his failure to comply with these conditions, see FAC ¶¶ 49–53, it too was wholly unrelated to

Plaintiff's disability or Defendants' failure to accommodate it.  In short, Plaintiff has not pleaded

that his employer failed to make any accommodation for his disability, as is required under the

Rehabilitation Act.  *Natofsky*, 921 F.3d at 352.[9]  That fact requires dismissal of Plaintiff's failure to

accommodate accommodations claim.

---

[9] Even if Plaintiff had pleaded that Defendants had failed to accommodate his disability, the Court observes that he would ultimately have the further burden of establishing that his requested accommodation—removal of conditions on leave—was reasonable.  An accommodation that results in the elimination of an essential function of a job is not reasonable.  *McMillan*, 711 F.3d at 127.  Plaintiff worked for the USMS as a Detention Enforcement Officer, FAC ¶ 14, and the 2016 Letter notes that the conditions on Plaintiff's use of leave were imposed because his "excessive absenteeism" had been "adversely affecting both daily staffing and employee morale."  Dkt. No. 19-1 at 1.  These facts suggest that attending work regularly was an essential function of Plaintiff's employment and that the conditions on Plaintiff's use of leave were necessary to ensure that Plaintiff performed that essential function.  *See Lewis v. N.Y. City Police Dep't*, 908 F. Supp. 2d 313, 327 (E.D.N.Y. 2012) (an employer need not "tolerate chronic absenteeism even when attendance problems are caused by an employee's disability").  Because Plaintiff has not pleaded that Defendants failed to accommodate his disability, he has not stated a failure to accommodate claim, and the Court need not reach this question at this time.

       *4.   Mr. Figueroa Has Failed to Plausibly Allege Any Retaliatory Acts Connected*
            *to Protected Conduct Under the Rehabilitation Act or Title VII.*

Mr. Figueroa has also failed to state an actionable retaliation claim under either the

Rehabilitation Act or Title VII.  Those statutes differ, as relevant here, in the protected traits that

they cover:  Title VII protects against discrimination and retaliation based on race, 42 U.S.C.

§ 2000e-2(a), while the Rehabilitation Act protects against disability-based discrimination and

retaliation, 29 U.S.C. § 791.  But their elements are otherwise the same:  To state a claim under either

statute, a plaintiff must plausibly plead that he was engaged in a protected activity, that an adverse

action was taken against him, and that the protected activity was the cause of the adverse action.  *See*

*Natofsky*, 921 F.3d at 353; *Treglia*, 313 F.3d at 719; *Vega*, 801 F.3d at 90.

Plaintiff has adequately pleaded that he participated in several protected activities.  A

complaint or legal action challenging an employer's action is a protected activity "so long as the

employee has a good faith, reasonable believe that the underlying challenged actions of the employer

violated" Title VII or the Rehabilitation Act.  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs,*

*P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).[10]  Here, Plaintiff has plausibly stated three protected activities:

(1) the filing, around 2013, of an administrative complaint of discrimination based on disability

discrimination, (2) participation, also around 2013, in class-action litigation based on race, and (3)

the "early 2017" filing of "a formal administrative complaint of discrimination with the DOJ"

having to do with "discrimination and retaliation."[11]  FAC ¶ 47; *see* Pl's Opp. at 5 (clarifying that the

early 2017 compliant was "based on both race and disability discrimination"); *see also* FAC ¶ 25

(describing Plaintiff's first two protected activities).  Making reasonable inferences in Plaintiff's

---

[10] That Plaintiff has failed to make out any underlying discrimination claim "does not affect his ability to pursue his federal retaliation claim"; the retaliation claim can prevail "even when the underlying conduct complained of was not unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'"  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (quoting *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).
[11] Plaintiff's complaint is unclear on the exact timing of his first two protected activities, but the Court assumes that they occurred near 2013 because they were connected to the 2013 Letter of Leave Restriction.  *See* FAC ¶¶ 24–25.

favor, each of these activities represented Plaintiff's good-faith, reasonable belief that his employer's actions violated Title VII and the Rehabilitation Act, and therefore are protected activities for purposes of his retaliation claims.

Plaintiff, however, has failed to plausibly plead that any of these protected activities were the cause of adverse actions taken by his employer. A causal connection between a protected activity and an adverse action can be pleaded either directly, by alleging evidence of retaliatory animus directed against the plaintiff by the defendant, or indirectly, by pleading that the protected activity was closely following in time by discriminatory treatment. *Littlejohn*, 795 F.3d at 319. Mr. Figueroa does not state that there is any direct evidence of retaliatory animus, as he pleads only that he "believes" that his supervisors sought to retaliate against him. FAC ¶ 145. Accordingly, to establish his retaliation claim, he relies solely on the temporal connection between his protected activities and the allegedly retaliatory acts.

But the first two protected activities that Mr. Figueroa points to cannot serve as the basis for his retaliation claim in this fashion because they are too attenuated from any pleaded adverse actions. There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a . . . right and an allegedly retaliatory action." *Abrams v. Dep't of Public Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). Nonetheless, the Supreme Court and Second Circuit have both emphasized that the "temporal proximity" between the protected activity and the alleged retaliatory acts must be "very close" to plead retaliation in this fashion. *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 262, 273 (2001) (per curiam)).

Here, Mr. Figueroa points to his filing of an administrative complaint of discrimination and participation in class-action litigation based on race, both of which apparently occurred around 2013,

as bases for his retaliation claims.  FAC ¶ 25; *see* Pl's Opp. at 13.  But his complaint states that "[t]he discrimination and retaliation claims described herein took place in the SDNY from on or about September 2016 through 2018."  FAC ¶ 15.  The approximately three-year gap between these protected activities and any pleaded adverse actions is too attenuated to state the causation element of a retaliation claim, and so those activities cannot form the foundation of Plaintiff's claims.  *See, e.g.*, *Clark Cnty.*, 532 U.S. at 273 ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Natofsky*, 921 F.3d at 353 (holding that an alleged retaliatory action occurring "almost a year after" the protected activity was "too long a period of time" to allege a causal connection"); *Abrams*, 764 F.3d at 254 (stating that a five-month gap between the alleged protected activity and retaliation "might be" close enough to establish temporal proximity).

Timing issues also preclude Plaintiff's final protected activity—his "early 2017" filing of "a formal administrative complaint of discrimination with the DOJ" concerning both race and disability discrimination, FAC ¶ 47; *see* Pl's Opp. at 5—from forming the basis of his retaliation claims.  First, because actions concerning the conditions imposed on Plaintiff's use of leave occurred both before and after his filing of this complaint, Plaintiff has not established any inference that those actions were retaliatory.  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (Calabresi, J.) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").  The 2016 Letter (and other criticisms of Plaintiff's leave) occurred before Plaintiff's filing of his 2017 administrative complaint; the enforcement of the conditions it imposed (and, according to Plaintiff, the imposition of additional leave conditions) occurred both around that time and after.  *See, e.g.*, Dkt. No. 19-1 (2016 Letter, noting longstanding criticisms of Plaintiff's use of leave); FAC ¶¶ 49–53 (leave dispute in January 2017); FAC ¶¶ 70–76 (leave dispute

in March 2017); FAC ¶¶ 83–89 (leave dispute in July 2017).  So Plaintiff has not plausibly pleaded

that any disputes over leave conditions were retaliation for his 2017 administrative complaint.

That said, Plaintiff has pointed to one distinct action occurring outside of leave disputes that

could, if timed correctly, represent a retaliatory action for his 2017 complaint.  An action can form

the basis for a retaliation claim if "a reasonable employee would have found the challenged action

materially adverse, 'which in this context means it well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination.'"  *Burlington*, 548 U.S. at 68 (quoting *Rochon*,

438 F.3d at 1219).  Here, Plaintiff alleges that in early 2017, Smith included disciplinary letters from

2013 and 2016 in his retirement package even though the letters expressly stated that they were not

to be made a part of his official record.  FAC ¶¶ 98–99; *see also* Dkt. No. 19-1 at 3 (the 2016 Letter,

stating that "[t]his memorandum does not constitute a disciplinary action, nor will it be placed in

your Official Personnel Folder").  When Plaintiff's retirement application was subsequently

reviewed, he was not granted his retirement credentials, which he alleges has precluded him from

taking advantage of certain employment opportunities.  *Id.* ¶¶ 137, 148.  A reasonable worker would

have found the inclusion of Plaintiff's letters in his retirement package materially adverse given that

it could result in the deprivation of a post-retirement work benefit.  *See, e.g.*, *Vega*, 801 F.3d at 91

(noting that a poor performance evaluation or deduction of sick leave constitute materially adverse

actions in the retaliation context).[12]

---

[12] Making inferences in Plaintiff's favor, the Court assumes that the early 2017 *inclusion* of these letters in Plaintiff's retirement package, rather than the 2018 post-retirement denial of credentials that followed, represents the adverse action for purposes of his retaliation claim.  If the latter were the adverse action, it would be too temporally attenuated from the protected activity to undergird a retaliation claim.  *See Abrams*, 764 F.3d at 254 (suggesting that a five-month gap is near the outer bounds of temporal proximity for retaliation claims); *Clark Cnty.*, 532 U.S. at 273–74 (collecting cases where three-to-four-month gaps between the protected activity and retaliatory action were deemed too attenuated).  Moreover, because the Court treats the letters' 2017 inclusion—while Plaintiff remained employed at USMS—as the allegedly retaliatory action,  Defendants' (accurate) contention that a terminated employee must satisfy a higher bar for retaliation claims is inapposite to the Court's analysis.  *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

The problem, however, is that Plaintiff has not pleaded that the inclusion of the letters in his retirement package actually occurred after his 2017 administrative complaint and has therefore not plausibly pleaded that the letters' inclusion was retaliation for that complaint.  Specifically, Plaintiff has merely stated, without any additional detail, that both events occurred in "early 2017."  FAC ¶¶ 47, 102.  Without an assertion that his administrative complaint preceded the placing of the letters in his retirement package, there are no pleaded facts from which the Court can plausibly infer that the latter was retaliation for the former.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007))); *Gerritsen v. Glob Trading, Inc.*, No. 06-cv-3656, 2009 WL 262057, at *11 n.13 (E.D.N.Y. Feb. 4, 2009) ("[T]he Court cannot amend plaintiffs' Complaint *sua sponte*.").  Accordingly, this action also cannot form the basis for Plaintiff's retaliation claims, and those claims must be dismissed.

## VI.   LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  It is true that leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citation omitted).  But none of those conditions apply here:  the Court cannot conclude that a further amendment of the complaint would be futile.  And Plaintiff has not yet had the opportunity to amend the complaint with the benefit of a ruling from the Court.  "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the

practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).  Plaintiff is therefore granted leave to file an amended complaint to address the deficiencies identified in this order no later than 30 days from the date of this order.

## VII.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED without prejudice.  Plaintiff is given leave to amend his complaint to address the deficiencies identified in this order no later than 30 days from the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 17.

SO ORDERED.

Dated:  December 6, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge

34