UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/2023
```

--------------------------------------------------------------X

LUIS RAFAEL FIGUEROA, JR.,                    :
                                              :
                                  Plaintiff,  :
              -against-                        :          1:21-cv-7849-GHW
                                              :
MERRICK B. GARLAND, *in his official capacity as*  :    <u>MEMORANDUM OPINION &</u>
*the Attorney General of the United States and Head of*  :  <u>ORDER</u>
*United States Department of Justice, et al.,*   :
                                              :
                                  Defendants.  :

--------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

## I.      INTRODUCTION

Luis Rafael Figueroa, Jr. worked for the United States Marshals Service as a Detention

Enforcement Officer from February 2001 until his retirement in October 2017.  After working as a

first responder to the September 11 terrorist attack, Mr. Figueroa developed asthma, sinus, and

respiratory problems for which he required ongoing accommodations in the form of regular leave to

attend medical appointments.  In the latter part of his tenure with the Marshals Service, from 2013

until his retirement in 2017, Mr. Figueroa was placed on two restrictions regarding his use of leave.

He alleges that these restrictions—as well as other alleged hostile actions taken by his supervisors—

constituted discrimination and retaliation under two federal statutes.

Previously, the Court dismissed Mr. Figueroa's first amended complaint for failure to state a

claim on which relief could be granted.  But in his now-operative second amended complaint, Mr.

Figueroa has added allegations about the timing and circumstances surrounding the issuance of the

second leave restriction that raises a plausible inference that this restriction could have been

retaliatory.  And in light of the Court's conclusion on the viability of Mr. Figueroa's retaliation

claims and the Second Circuit's recent reemphasis that factual determinations about the hostility and

discriminatory nature of a work environment are usually best left to the finder of fact, the Court

further concludes that Mr. Figueroa's active complaint (narrowly) states a plausible hostile-work-environment discrimination claim. As a result, the motion to dismiss filed by Defendants—the Marshals Service and the United States Attorney General—is DENIED.

## II.    BACKGROUND[1]

### A.    Mr. Figueroa's Employment as a Detention Enforcement Officer

Plaintiff began work as a Detention Enforcement Officer ("DEO") with the United States Marshals Service ("USMS") in February 2001. Dkt. No. 31 (Second Amended Complaint, or the "SAC") ¶¶ 6, 28. He worked for the United States District Court in the Southern District of New York. *Id.* Mr. Figueroa's role as a DEO "was to assist with transport and housing of federal prisoners in the SDNY." *Id.* ¶ 13. The USMS is an agency within the Department of Justice. *Id.* ¶ 12.

Mr. Figueroa "was one of many USMS officer first responders who assisted at the site of . . . the World Trade Center on September 11, 2001," and he continued working at the World Trade Center site "in the days and months following" the September 11 attacks. *Id.* ¶ 7. Because of the time he spent at the World Trade Center following September 11, Mr. Figueroa developed "disabling severe asthma and respiratory problems" as well as sinus problems. *Id.* ¶¶ 8, 31. Mr. Figueroa required accommodations from the USMS so he could take regular leave to attend medical appointments and receive treatment. *Id.* ¶¶ 8, 33.[2]

In 2010, Mr. Figueroa gave a letter from his physician to his then-supervisors. *Id.* ¶ 35. The letter described Mr. Figueroa's asthma, sinus, and respiratory problems for which he required

---

[1] The facts are drawn from Plaintiff's second amended complaint. Dkt. No. 31 ("SAC"). For this motion, the Court must accept as true the facts alleged in the amended complaint. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] In October 2016, Mr. Figueroa was in a car accident and suffered a knee injury that required ongoing medical treatment and, thus, additional leave. SAC ¶¶ 32–33.

intermittent leave to receive treatment and to pursue a workers' compensation benefits claim.  *Id.*
Sometime after he submitted his letter, he was informed by one of his supervisors that another
supervisor, CDUSM John Csakany, had stated "I was there [on 9/11], and nothing happened to
me."  *Id.* ¶ 36.  Plaintiff understood this comment to mean that CDUSM Csakany was questioning
the authenticity of his 9/11-related injuries and was expressing opposition to Mr. Figueroa's need to
take medical leave to treat those injuries.  *Id.* ¶ 37.

### B.  2011 to September 2016

In 2011 and 2012, Plaintiff filed numerous complaints based on race and disability
discrimination through the Federal Sector EEO administrative process.  *Id.* ¶ 14.  During this
period, he also began participating in class-action litigation concerning race-based employment
discrimination against Detention Employment Officers ("DEOs") nationwide.  *Id.* ¶ 16.  Plaintiff's
administrative complaints were settled in May 2013.  *Id.* ¶ 15.  But in September 2013, just after
those complaints had been settled, the USMS and Plaintiff's supervisor SDUMS Joel Blackman
issued Mr. Figueroa a "Letter of Leave Restriction" (the "2013 Letter") due to his purportedly
excessive use of leave for "workers' compensation related medical appointments and for care of his
infant daughter."  *Id.* ¶¶ 15, 39.  In response, Mr. Figueroa took two actions.  First, he filed an
administrative complaint claiming that the 2013 Letter was discriminatory because of his asthma,
sinus, and respiratory disabilities and retaliatory because of his prior EEO activity and class-action
participation.  *Id.* ¶¶ 16, 41.  Second, in an attempt to have the restrictions imposed by the 2013
Letter lifted, Plaintiff filed a grievance through his union to contest it.  *Id.* ¶¶ 17, 42.

On November 6, 2014, Plaintiff's grievance was resolved and the restrictions imposed by the
2013 Letter were lifted.  *Id.* ¶¶ 17, 44.  Nonetheless, both before and after the restrictions imposed
by the 2013 Letter were revoked, Plaintiff was experiencing "escalat[ing] harassment and
discrimination from his supervisors related to his use of leave for ongoing medical treatment related

3

to his 9/11 injuries." *Id.* ¶ 47. According to Plaintiff, "[i]t was so difficult for Plaintiff to request and use his accrued sick and annual leave, that Plaintiff often could not attend his medical appointments in a timely manner." *Id.* ¶ 48. The harassment that Mr. Figueroa faced led him to "not make a request or try to bundle appointments on one day to avoid the harassment he would inevitably experience if he made multiple requests for leave in any given time period." *Id.* ¶ 49.

Plaintiff's administrative complaint about the imposition of the 2013 Letter was finally resolved when the DOJ's Office of Complaint Adjudication issued a Final Order on that complaint on September 6, 2016. *Id.* ¶¶ 20, 45.[3] After that decision was issued, and in light of the "continued harassment" that he was enduring because of his need to take medical leave, "Plaintiff finally decided that he had no other choice but to seek a disability retirement from the agency." *Id.* ¶ 51; *see also id.* ¶¶ 146–147 (a sign-in sheet was implemented on September 16, 2016, and Plaintiff observed that only his use of the sheet was monitored by management). From September 22 through September 28, 2016, Plaintiff inquired about and then submitted his initial application for disability retirement to one of his then-supervisors, SDUSM Smith. *Id.* ¶¶ 52–54. Later in the day on September 28, 2016, and still only weeks following the final adjudication of Plaintiff's administrative complaint concerning the 2013 Letter, USMS (though SDUSM Blackman) issued another Letter of Leave Restriction to Plaintiff. *Id.* ¶¶ 21, 55; *see* Dkt. No. 19-1 (the "2016 Letter").

That letter, Plaintiff states, "was nearly identical to the 2013 Letter" that had been rescinded in 2014. *Id.* ¶ 21. It stated that it was issued to address "excessive absenteeism" and "a possible abuse of leave." 2016 Letter at 1. The letter imposed numerous requirements. It required Mr. Figueroa to request all sick leave for "prearranged medical appointments or care of a family member" in advance while reserving the right to deny the request if the USMS needed Mr.

---

[3] While Plaintiff does not state whether his complaint was resolved in his favor, other facts in the complaint allow the Court to make the reasonable inference that the complaint was resolved adversely to him. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

Figueroa's services.  *Id.* at 1.  If Mr. Figueroa did not receive approval of a request and failed to show up for his shift, his supervisor could report him as "absent without approved leave (AWOL)." *Id.*  Requests would be denied if Mr. Figueroa did not have sufficient accrued leave to cover the requested absence.  *Id.* at 1–2.  The 2016 Letter also reminded Mr. Figueroa that emergency requests must be rare and required him, when making any such request, to notify his supervisor "no later than 30 minutes prior to the start of [his] shift" and to provide "the exact nature of the emergency and how long [Mr. Figueroa] expect[ed] to be away from the office."  *Id.* at 2.  It also required that Mr. Figueroa provide medical documentation for emergency leave before the end of the pay period when he took the leave.  *Id.*  If Mr. Figueroa failed to provide this documentation, his supervisors reserved the right to mark him as AWOL for his absence.  *Id.*

Finally, the 2016 Letter required Mr. Figueroa to request annual leave at least twenty-four hours in advance and noted that the request would be denied if he had not accrued sufficient annual leave to cover the absence.  *Id.*  Mr. Figueroa was prohibited from using leave requests to cover any tardiness, except in the case of an emergency.  *Id.* at 3.  Similarly, the letter disallowed the use of leave without pay ("LWOP") except in cases of emergency or if Mr. Figueroa invoked the Family Medical Leave Act (the "FMLA").  *Id.*  Mr. Figueroa also had to provide "supporting medical documentation for the request."  *Id.*  When Mr. Figueroa planned to use FMLA leave, he had to notify his supervisor and provide "acceptable medical documentation."  *Id.*  The letter had no end date, SAC ¶ 70, except that it was to remain in his file until Plaintiff showed he could consistently abide by leave requirements.  2016 Letter at 3.  The letter also stated that it was not itself a disciplinary action and that it was not to be placed in Mr. Figueroa's official file.  *Id.* at 4.

### C.  September 2016 to June 2017

After the issuance of the 2016 Letter and Plaintiff's application for disability retirement, Plaintiff alleges that the "hostile and discriminatory conduct" that he experienced "escalated."  SAC

5

¶ 70; *see also id.* ¶ 26 ("Plaintiff's supervisors proceeded to use the 2016 letter as pretext to continually harass Plaintiff and interfere with his use of leave to seek continued medical treatment.").  "As soon as he submitted his application" for disability retirement, Mr. Figueroa's supervisor SDUSM Smith "began submitting complaints about minor infractions to Internal Affairs that would normally not trigger a complaint or any discipline, most of which were related to Plaintiff's leave requests and attendance, which Smith falsely alleged that Plaintiff was abusing." *Id.* ¶ 174.  Mr. Figueroa believed that Smith was attempting to get him fired before he could receive his disability retirement.  *Id.* ¶ 176.  He also believed, alternatively, that Smith wanted to ensure he did not retire in good standing.  *Id.*

While Plaintiff took issue with the restrictions imposed by the 2016 Letter, he also came to believe that Smith "had a different set of rules" concerning leave that "he applied only to Plaintiff" that went above and beyond what the 2016 Letter dictated.  *Id.* ¶ 65; *see also, e.g., id.* ¶ 145 ("No one else in Plaintiff's department" was subjected to treatment like Mr. Figueroa).  For example, despite witnessing "numerous employees leave the office without signing out and/or inputting the end of their shift (4:00pm) leaving the office at 3:30 PM almost every day for months," management said nothing to them.  *Id.* ¶ 148.  Mr. Figueroa "was the only one being watched by management when he signed in and signed out."  *Id.* ¶ 147.  According to Plaintiff, Smith also insisted that Plaintiff provide him and other supervisors doctor's notes for all of Plaintiff's medical appointments, even though that was inconsistent with USMS policy.  *Id.* ¶ 66.  And Smith called the office of Plaintiff's medical provider to verify Plaintiff's medical appointments, which he did not do for Plaintiff's co-workers.  *Id.* ¶ 67.

On December 27, 2016, "the morning shift employees were allowed to go home for the day early at 1pm."  SAC ¶ 157.  When Mr. Figueroa called Smith to ask if he could leave, Smith told Mr. Figueroa that he had to stay until 4:00 p.m. because he was doing union duty that day and thus was

on "Union time." *Id.* ¶¶ 158–159.  Around 2:25 p.m., after completing union business for the day, Mr. Figueroa received permission from another supervisor (AASUSM Saleh) to leave for the day around 2:45 p.m.  *Id.* ¶ 163.  Mr. Figueroa signed out at home at 4:00 p.m. like his fellow shift-members.  *Id.* ¶ 164.  Two days later, on December 29, 2016, Smith told Mr. Figueroa that he would be charged as AWOL from 2:45–4:00 p.m. and that Smith had reported Mr. Figueroa to Internal Affairs.  *Id.* ¶ 165.

In "early 2017," Mr. Figueroa filed another formal administrative complaint with the Department of Justice regarding alleged discrimination.  *Id.* ¶ 74.  Because "[t]he unlawful conduct continued," Mr. Figueroa "had to amend his administrative complaint . . . several times."  *Id.* ¶ 75.  On March 29, 2017, an arbitrator heard Mr. Figueroa's complaint alleging that the USMS "committed an unwarranted and unjustified action . . . by issuing the [2016] Restriction Letter." Dkt. 19-3 (2017 Arbitration Opinion, or "Arb. Op.") at 11.  On June 28, 2017, the arbitrator found that Mr. Figueroa's "excessive and abusive use of leave justified the [USMS's] issuance of the [2016] Restriction Letter."  *Id.*

Meanwhile, however, the harassment of Plaintiff by his supervisors allegedly continued. SAC ¶ 75.  For instance, on January 17, 2017, Smith questioned Mr. Figueroa about his request to use eight hours of sick leave to go to a doctor's appointment.  *Id.* ¶¶ 76–77.  When Mr. Figueroa informed Smith that he had made a mistake in the request and intended to use four hours of sick leave and four hours of LWOP, Smith told Mr. Figueroa he could only use four hours of LWOP and was required to report to work for four hours prior to the doctor's appointment.  *Id.* ¶¶ 78–80. When Mr. Figueroa walked away from Smith, thinking the conversation was over, Smith called him back over and "scolded" and "yelled at" Plaintiff not to walk away when Smith was speaking to him; Mr. Figueroa never raised his voice in response.  *Id.* ¶¶ 81–85.  When Plaintiff then told Smith that "he was not comfortable with Smith making statements about his 9/11 related medical

appointments in front of other staff, . . . Smith responded in a very loud tone that could be overheard, 'Aren't you the one that wanted his face up on the memorial?'" *Id.* ¶ 87.  That comment, Plaintiff says, referred to Plaintiff's recent complaint in an administrative grievance that he had been left out of a 9/11 memorial.  *Id.*  Mr. Figueroa also notes an incident on January 12, 2017, when he was denied a sick leave request for a dentist appointment because he had not accrued enough leave by that date, even though Plaintiff would have accrued enough leave to go to the appointment by the date of the appointment (February 3, 2012).  *Id.* ¶ 91.  Mr. Figueroa had to request the leave again once he had accrued enough sick leave.  *Id.* ¶ 93.

On March 20, 2017, after Mr. Figueroa requested leave for "Union time" later that day, Smith walked closely by Mr. Figueroa's cubicle and said "in a menacing tone" that that was "not how you're going to get your Union Time approved.  You need to up your level of professionalism." *Id.* ¶¶ 103, 105.  Smith made that comment even though the 2016 Letter did not cover leave time for union activities.  *Id.* ¶ 104.  Four days later, "SDUSM denied Plaintiff's leave request stating that he did not have sufficient leave for the request."  *Id.* ¶ 107.  But Mr. Figueroa did have enough leave for the request, and he had to convince Smith for "more than a half hour" that he had enough leave balance for his request; Smith eventually relented and agreed that Mr. Figueroa did have sufficient leave.  *Id.* ¶ 110.  Based on Smith's "tone and demeanor[,]" he seemed to regard this instance as "unprofessional."  *Id.* ¶ 111.

### D.  July 2017 to October 2017

Four months later, on July 27, 2017, Mr. Figueroa was running late for work because he was stuck behind a garbage truck; he called the supervisor on duty to "advise him of this predicament." *Id.* ¶ 112–113.  Mr. Figueroa arrived to work at 7:40 a.m., signed in, and told Smith he would report for duty once he changed into his uniform.  *Id.* ¶ 115–116.  "DEOs . . . are allowed a 10 minute 'doffing and donning' period once they arrive for their shift to change," but Smith chastised Mr.

Figueroa "loudly and told him that he had signed him in at 7:51am." *Id.* ¶ 117–118.  According to

Mr. Figueroa, Smith "did not similarly admonish any other DEOs in the same manner or mark them

in late[ ] . . . [i]n fact, Smith frequently turned a blind eye to other DEOs who changed after the start

of their shift, even when they arrived late." *Id.* ¶¶ 120–121.

On Saturday, August 5, 2017, Smith emailed Mr. Figueroa asking for medical documentation

to support upcoming leave requests.  *Id.* ¶ 122.  Smith said he would deny the requests without the

documentation that he requested.  *Id.* ¶ 125.  "Smith continued to make these requests for many of

Plaintiff's regular sick leave requests."  *Id.* ¶ 126.  On September 1, 2017, everyone working the

"early shift" was allowed to leave work at 1:00 p.m. and "claim time worked up to 4pm," while Mr.

Figueroa "was not told he could leave early . . . [and] stayed in the office until the end of his shift at

4pm." *Id.* ¶ 149.

### E.  Mr. Figueroa's 2017 Retirement and the 2018 Denial of Post-Retirement Credentials

When the USMS officially granted Mr. Figueroa his disability retirement effective on

October 28, 2017, the 2016 Letter's restrictions were still in effect.  *Id.* ¶ 141.  Smith had included

both the 2013 Letter and the 2016 Letter, along with email counseling and a 2012 email outlining

"performance concerns," in Mr. Figueroa's retirement application.  *Id.* ¶ 129.  He did so even though

the 2013 and 2016 Letters both state that they are not to be made part of Plaintiff's official record.

*Id.* ¶ 130.  Plaintiff alleges that Smith either knew or should have known that by including those

letters and the 2012 memorandum on performance concerns in Plaintiff's retirement application,

Plaintiff's application for retirement credentials would be denied.  *Id.* ¶ 132.

On October 17, 2017, Mr. Figueroa applied to Chief Peter McCauley for his post-retirement

credentials.  *Id.* ¶ 167.  These credentials, if granted, would indicate that Mr. Figueroa had left the

USMS in good standing and would allow him to carry a firearm after retirement.  *Id.* ¶ 179, 185.  But

on January 28, 2018, Mr. Figueroa received a denial of his request for post-retirement credentials

because of "substantial allegations of misconduct against you at the time of your separation, which were significant enough that granting credentials is not in the best interest of the USMS." *Id.* ¶ 168. Mr. Figueroa requested that the decision be reconsidered because he believed that denying him retirement credentials was retaliation for his still-pending discrimination complaint. *Id.* ¶¶ 169–170. In response to his request for reconsideration, the USMS informed him on February 8, 2018 that work records showed there were open allegations against him upon retirement and that it had "become known that you have had negative contact with law enforcement post retirement." *Id.* ¶ 171. Neither of these allegations were true. *Id.* ¶ 172. Additionally, "nothing ever happened with" Smith's complaints to Internal Affairs and "none were ever deemed founded." *Id.* ¶ 175; *see also id.* ¶ 177 (noting that Internal Affairs reviewed Mr. Figueroa's actions twice, but he "never received a disposition nor was he ever brought up on charges or otherwise disciplined"). Without retirement credentials, Mr. Figueroa asserts, he cannot possess or carry a firearm, which limits his employment opportunities to jobs that do not require him to be able to possess a firearm. *Id.* ¶¶ 179, 181; *see also id.* ¶¶ 182–183 (Plaintiff listing positions for which he applied but was not hired because, he says, he lacks retirement credentials and cannot carry a firearm).

## III.    PROCEDURAL HISTORY

Mr. Figueroa commenced this lawsuit on September 20, 2021. Dkt. No. 1. He filed his First Amended Complaint on April 8, 2022. Dkt. No. 15. On December 6, 2022, the Court granted Defendants' motion to dismiss that complaint in full. Dkt. No. 29 ("MTD I"). The Court first found that it would be improper to give preclusive effect to any previous decisions made in the 2017 Arbitration Opinion because those arbitration proceedings did not resolve any statutory claims (which are the subject of Plaintiff's federal complaint). *Id.* at 19–22. Nonetheless, the Court granted Defendants' motion as to Plaintiff's discrimination claim because Mr. Figueroa had not plausibly pleaded that he suffered any adverse action based on his disability, that he suffered a severe-and-

pervasive hostile work environment, or that Defendants had failed to accommodate his disability. *Id.* at 22–28.  And the Court granted Defendants' motion as to Plaintiff's retaliation claim because Mr. Figueroa had failed to sufficiently connect any specific protected activities to alleged retaliatory acts taken by Defendants.  *Id.* at 29–33.  Though the Court thus granted Defendants' motion to dismiss in full, it also gave Plaintiff leave to replead all of his claims within thirty days of the order and opinion.  *Id.* at 33–34.

Plaintiff exercised his leave to replead by filing the second amended complaint on January 5, 2023.  Dkt. No. 31.  Like the first amended complaint, the second amended complaint brings three causes of action:  (1) disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, SAC ¶¶ 187–191; (2) retaliation under the Rehabilitation Act, SAC ¶¶ 192–194; and (3) retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, SAC ¶¶ 195–197.[4] On March 27, 2023, Defendants moved to dismiss the second amended complaint in full.  Dkt. No. 39 (motion); Dkt. No. 40 (memorandum in support, or "Defs' Mem.").  They argued that the second amended complaint was largely a retread of Plaintiff's prior complaint, and that any new facts were insufficient to state a claim on which relief could be granted.  *See generally* Dkt. No. 40. Plaintiff opposed Defendants' motion on April 24, 2023.  Dkt. No. 43 ("Pl's Opp.").  He argued, among other things, that USMS intentionally "waited" to issue the 2016 Letter until after a final decision on his administrative complaint concerning the 2013 Letter was issued in September 2016, and that the timing of the 2016 Letter was thus designed to discourage him from pursuing his complaint about the 2013 Letter in federal court after the administrative proceedings were finalized.

---

[4] In the previous opinion in this case, the Court explained that Plaintiff's first cause of action represented three different theories of discrimination that could be considered as distinct claims.  *See* Dkt. No. 29 at 9 n.4.  As explained below in Part V(A), while these theories remain separate means by which a discrimination claim can be plausibly stated, the Court need not address each theory in this opinion.

*Id.* at 13.  Defendants replied on April 27, 2023, Dkt. No. 44 ("Reply"), at which time the motion was fully briefed.

## IV.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79).  Thus, a complaint that offers "labels and conclusions" or "naked

assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

### B. Consideration of Documents Outside of the FAC

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006). But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)). A court may also consider a document relied on by the plaintiff if it "is integral to the complaint." *Id.* (quotation and brackets omitted). A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC" on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint" (quotation and brackets omitted)). A plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Nicosia*, 834 F.3d at 231 (emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006)).

In addition to documents incorporated by reference or those integral to the complaint, the Court may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). "Courts may take judicial notice *sua sponte* . . . of facts that are 'not subject to reasonable dispute' because it 'is generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot be questioned.'" *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 48 n.15 (S.D.N.Y. 2022) (quoting Fed R. Evid. 201(b)); *see also* Fed. R. Evid. 201(c)(1) ("The court may take judicial notice on its own."). "[C]ourts have regularly taken judicial notice of arbitration awards and collective bargaining agreements in considering a motion to dismiss." *Cox v. Perfect Building Maintenance Corp.*, 16-cv-7474, 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017).

Based on these standards, the Court has considered three documents outside of the second amended complaint in resolving Defendants' motion to dismiss: (1) the 2016 Letter of Leave Restriction, (2) the United States Marshals Service Leave Administration Policy, and (3) the 2017 Arbitration Opinion. *See* Dkt. No. 19 Exs. 1–3. First, the Court has considered the 2016 Letter of Leave Restriction, Dkt. No. 19-1, because the 2016 Letter is integral to the second amended complaint; the complaint repeatedly relies on the letter's terms and effects. *See, e.g.*, SAC ¶¶ 55–56, 61–62, 68. Second, the Court has also considered the United States Marshals Service Leave Administration Policy as integral to Plaintiff's active complaint, *see* Dkt. No. 19-2 (the "USMS Policy"), because Mr. Figueroa argues that certain restrictions placed on him were inconsistent with the USMS Policy—an argument that relies on the terms of that policy's terms. *See* SAC ¶ 66. Finally, the Court takes judicial notice of the 2017 Arbitration Opinion to determine what statements it contains. Dkt. No. 19-3 ("Arb. Op."); *see Mosdos Chofetz Chaim, Inc. v. Vill. Of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) ("In the motion to dismiss context . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . .

not for the truth of the matters asserted [in the documents]." (first two alterations in original) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). There is no dispute about what statements the 2017 Arbitration Opinion contained; as such, the Court may consider what it stated.

## V.   DISCUSSION

### A.   Discrimination Claim

Plaintiff has plausibly pleaded a discrimination claim under the Rehabilitation Act based on a hostile-work-environment theory. The standard for pleading a hostile work environment claim under the Rehabilitation Act is the same as the standard under the ADA and Title VII. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (adopting Title VII's standard as the ADA standard); 29 U.S.C. § 794(d) (incorporating the standards for violating the ADA into the Rehabilitation Act); *Leftridge v. N.Y.C. Dep't of Educ.*, No. 17-cv-7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) ("The standard for demonstrating a hostile work environment is the same under Title VII, the ADA, [and] the Rehabilitation Act."). To state a hostile-work-environment claim under any of those statutes, a plaintiff must plausibly plead that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris*, 510 U.S. at 21). "Courts are . . . 'cautioned to consider the totality of the circumstances, and to evaluate the quantity, frequency, and severity of the incidents,' and must consider those factors 'cumulatively, so that we may obtain a realistic view of the work environment.'" *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 74 (2d Cir. 2023) (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 437 (2d Cir. 1999)). "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321.

And finally, a plaintiff must plausibly plead "that the hostile conduct occurred because of a protected characteristic." *Tolbert*, 790 F.3d at 439 (2d Cir. 2015).

In the first motion to dismiss opinion, the Court found that Plaintiff had not shown that most of the incidents underlying this claim—including the restrictions imposed by the 2016 Letter and SDUSM Smith, specific denials of leave based on disputes over leave balance or how leave was requested, allegations that Smith spoke to Plaintiff in a menacing tone about his professionalism, and Smith's purported singling out of Plaintiff for adverse treatment—were meaningfully connected to Plaintiff's disability.  MTD I at 25–26.  And the Court further determined that the two comments recounted by Plaintiff that were connected to his disability—CDUSM Csakany's statement that "I was there [on 9/11], and nothing happened to me," and the mocking of Plaintiff for wanting to be included in a memorial for 9/11 victims—were not objectively severe or pervasive enough to plausibly state a hostile-work-environment claim.  *Id.* at 26–27.

For three reasons, and although it is an admittedly close call, the Court now finds that Plaintiff has "'nudg[ed]' his claim of purposeful discrimination 'across the line from conceivable to plausible.'"  *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570).  First, Plaintiff now states that the pattern of discrimination that he experienced began in 2013, rather than in 2016.  *Compare* SAC ¶ 29, *with* Dkt. No. 15 ("FAC") ¶ 15.  And he has specifically added an explanation of why, in his view, the 2013 Letter—which was issued during that time period—represented discrimination against him.  *See* SAC ¶ 16.  So Plaintiff has added, albeit marginally, to his overall allegations concerning the purported hostility of his workplace.

Second, the Second Circuit's recent decision in *Williams v. New York City Housing Authority* has prompted this Court to examine Plaintiff's claims afresh.  *See* 61 F.4th 55 (2d Cir. 2023).  In *Williams*, which was issued roughly two months after the first motion-to-dismiss opinion in this case, the Second Circuit reviewed a district court decision that involved five total alleged hostile incidents.

16

*See* 61 F.4th at 70–76.  The district court had determined that there was no direct evidence linking two of those incidents to any "discriminatory intent" on the part of the defendants, and therefore declined to consider them as part of the hostile-work-environment "totality of the circumstances" analysis.  *Id.* at 75.  But the Second Circuit found that this "misapplied" the relevant legal test, because the plaintiff had alleged "an orchestrated effort" to discriminate against her; as a result, the court held, those incidents should have been considered to provide a "realistic view of the work environment."  *Id.* (quoting *Richardson*, 180 F.3d at 437).[5]  Given that Plaintiff alleges that all of the incidents he suffered were part of a pattern of discrimination, *see* SAC ¶ 29, this Court must consider all of the alleged incidents together (even if many of them appear disconnected from any discriminatory intent).

Even doing so, Plaintiff's hostile-work-environment claim remains admittedly marginal.  As described above, they largely focus on leave disputes, excessive scrutiny, and aggressive workplace criticism.  Other courts have found similar experiences insufficient to state a hostile-work-environment claim.  *See, e.g.*, *Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 473 (S.D.N.Y. 2013) (finding that a person who was "subjected to excessive scrutiny," purposefully "intimidated" through repeat staring, was "publicly scold[ed] . . . in front of her . . . coworkers," given "negative performance evaluations," was "moved to a poorly ventilated, windowless office," and "refused training opportunities" had not suffered a hostile work environment, and collecting other cases reaching similar results).

---

[5] *Williams* involved a claim under the New York State Human Rights Law (the "NYSHRL") rather than under the Rehabilitation Act that faced a motion for summary judgment rather than a motion to dismiss.  *See* 61 F.4th at 66–67. But neither of those differences alter *Williams's* application here.  Discrimination standards are the same under the NYSHRL as under the Rehabilitation Act.  *See Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003) (noting that the ADA and the Rehabilitation Act impose "identical requirements"); *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (noting that the "same standards" apply to ADA and NYSHRL claims).  And the procedural posture of a motion to dismiss is even more plaintiff-friendly than that of a summary-judgment motion.  *Compare Burch* , 551 F.3d at 124 (on a motion to dismiss, a court must accept all pleaded facts as true and draw all reasonable inferences in the plaintiff's favor), *with Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (on a defendant's summary-judgment motion, a court must view the evidence in the plaintiff's favor and draw all reasonable inferences in favor of the plaintiff).

But again, the Second Circuit's decision in *Williams* is instructive.  There, the court held that five incidents—a supervisor's comment that she wanted a "Spanish manager," an attempt to transfer the plaintiff, an "aggressive statement[ ]" about the plaintiff's work, an alleged failure to hire assistants for the plaintiff, and the replacement of an important co-worker of the plaintiff's—were sufficient, when viewed in their totality, for the plaintiff's hostile-work-environment claim to survive summary judgment.  *Williams*, 61 F.4th at 70–76.  And it did so while emphasizing that decisions about whether incidents are sufficiently severe or pervasive are typically "determinations for the jury, not the judge, to make."  61 F.4th at 76; *see id.* ("An Article III judge is not a hierophant of social graces and is no better suited than a jury to decide if conduct rises to the level of a hostile work environment." (internal citation and quotation marks omitted)).  *Williams* thus serves as a signal to be cautious not to resolve questions of severity and pervasiveness at a too-early stage of litigation before full factual development.  That message informs the Court's decision here.

Finally—and significantly—the Court has made the determination that Mr. Figueroa's second amended complaint has plausibly pleaded retaliation claims under the Rehabilitation Act and Title VII.  *See infra* Part V(B).  The adequacy of the second amended complaint's allegations supporting those claims is clear.  As a result, this case will proceed to discovery regardless of the Court's determination regarding Plaintiff's discrimination claim.  And because Plaintiff alleges that many incidents reflected both discrimination and retaliation, dismissing solely the discrimination claim would likely do little (if anything) to narrow the scope of discovery.  *See, e.g.*, SAC ¶¶ 16, 23, 47.  As a result, and for the other reasons provided in this section, the Court finds that Plaintiff has plausibly pleaded his discrimination claim under the Rehabilitation Act.[6]

---

[6] Because the Court finds that Plaintiff's discrimination claim has been plausibly pleaded under a hostile-work-environment theory, it need not (and does not) address whether his claim is plausibly pleaded under either a disparate-treatment or a failure-to-accommodate theory.  *See* Pl's Opp. at 5–12 (addressing those theories).  Without making any finding on these questions, the Court notes that many of the reasons that those theories were not plausibly pleaded in

### B. Retaliation Claims

Plaintiff has plausibly pleaded retaliation claims under both the Rehabilitation Act and Title VII.  As relevant here, those statutes differ in the protected traits that they cover:  Title VII protects against discrimination and retaliation based on race, 42 U.S.C. § 2000e-2(a), while the Rehabilitation Act protects against disability-based discrimination and retaliation, 29 U.S.C. § 791.  But their elements are otherwise the same.  To state a retaliation claim under either statute, a plaintiff must plausibly plead that he was engaged in a protected activity, that an adverse action was taken against him by someone with knowledge of that activity, and that the protected activity was the cause of the adverse action.  *See Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (Rehabilitation Act); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015) (Title VII).

With respect to an adverse employment action, a plaintiff must plead "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "We speak of *material* adversity because we believe it is important to separate significant from trivial harms."  *Id.* (emphasis in original).  That said, "[t]his definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII [or the Rehabilitation Act]:  'The antiretaliation provision, unlike the substantive discrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 64) (brackets omitted).

---

the first amended complaint would appear to apply to the second amended complaint, as there are relatively few factual enhancements in the new complaint relevant to these theories.  *See* MTD I at 22–25, 27–28.

For the final element, causation, a plaintiff must allege facts suggesting that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quotation omitted). Nonetheless, a causal connection in retaliation claims can be pleaded either "(1) indirectly, by [pleading] that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

In the second amended complaint, Plaintiff has provided facts that plausibly support the elements of a retaliation claim under both Title VII and the Rehabilitation Act. He states that the 2013 Letter was imposed after he filed several administrative complaints in 2011 and 2012 alleging both race and disability discrimination, even though those complaints had been settled in May 2013. SAC ¶¶ 14–15. After he filed a grievance contesting the 2013 Letter, it was revoked in November 2014. *Id.* ¶ 17. But Plaintiff also filed an administrative complaint in 2013 regarding the 2013 Letter, which was not finally resolved until a September 6, 2016 Final Order. *Id.* ¶¶ 16, 18. Then, weeks after the Final Order's issuance, Plaintiff's supervisors—who allegedly knew about the Final Order and the underlying complaints—issued the 2016 Letter, which was materially identical to the 2013 Letter. *Id.* ¶¶ 20–22. And the 2016 Letter also came just after Plaintiff initiated the process of applying for disability retirement, and during the ninety-day window when Plaintiff had to determine whether or not to take his grievance concerning the 2013 Letter to federal court. *Id.* ¶¶ 21, 52–56.

Plaintiff's decision to file an administrative complaint concerning the 2013 Letter was a protected activity. A complaint or legal action challenging an employer's action is a protected activity "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated" Title VII or the Rehabilitation Act. *Kelly v. Howard I. Shapiro &*

*Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).  Here, the gravamen of Plaintiff's administrative complaint was that the 2013 Letter represented discrimination and retaliation for Plaintiff's prior EEOC activity in 2011 and 2012 concerning alleged race-and-disability-based discrimination, as well as for Plaintiff's participation in a class-action lawsuit based on race discrimination.  SAC ¶ 16.  Assuming facts and making inferences in Plaintiff's favor, as the Court must at this stage, Plaintiff thus had a good-faith belief that the issuance of the 2013 Letter was itself unlawful, and Plaintiff's complaint about that letter was accordingly a protected activity.

Plaintiff has also plausibly pleaded that an adverse action was taken by someone with knowledge of the protected activity.  Plaintiff states that his supervisors were aware of his administrative complaint about the 2013 Letter, and were aware of the fact that the Final Order on that complaint was issued on September 6, 2016.  *Id.* ¶ 20.  And the issuance of the 2016 Letter was an adverse action.[7]  Taking Plaintiff's facts as true and making reasonable inferences in his favor, a "reasonable employee would have found" the reimposition of stringent limitations on requesting leave "materially adverse," given that such an employee might be dissuaded from making a charge of discrimination or retaliation (like the complaint about the 2013 Letter) if she knew that the result of doing so could be the reimposition of limitations even after a previous finding that the limitations were unnecessary.  *Burlington*, 548 U.S. at 68 (internal citation omitted); *see* SAC ¶ 17 (noting that the restrictions imposed by the 2013 Letter were lifted on November 6, 2014 after Plaintiff's grievance was resolved).[8]

---

[7] For the reasons explained in the first motion-to-dismiss opinion, that an arbitrator previously found justification for the issuance of the 2016 Letter does not affect this Court's analysis.  *See* MTD I at 19–22.

[8] The Court's previous opinion found that the issuance of the 2016 Letter was not an adverse employment activity for purposes of Plaintiff's *discrimination* claim.  MTD I at 23.  But as described above, the standard for adversity in the *retaliation* context is more plaintiff-friendly; an adverse action need not "affect the terms and conditions of employment," *Vega*, 801 F.3d at 90, so long as it "might . . . dissuade[ ] a reasonable worker from making or supporting a charge of discrimination," *Burlington*, 548 U.S. at 68.  So the 2016 Letter is sufficiently adverse to undergird a retaliation claim even if it could not similarly support a discrimination claim.

Finally, Plaintiff has also plausibly pleaded a causal connection between the relevant protected activity (his administrative complaint about the 2013 Letter) and adverse action (the issuance of the 2016 Letter). Even absent direct evidence of retaliatory animus, "a causal connection in retaliation claims can be pleaded . . . indirectly, by [pleading] that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence . . . ." *Littlejohn*, 795 F.3d at 319 (internal citation omitted). Here, the 2016 Letter was issued just weeks after Plaintiff's complaint about the 2013 Letter was finally resolved. *See* SAC ¶¶ 18–21. And because it was issued both during the ninety-day window in which Plaintiff could have chosen to appeal his administrative complaint to federal court, and just after Plaintiff began the process of applying for disability retirement, the 2016 Letter was issued at a time when it had the greatest potential to disrupt Plaintiff's further complaints and retirement plans. *Id.* ¶¶ 19, 21. The timing of the letter and the surrounding circumstances in which it was issued thus give rise to a sufficient inference of retaliation for Plaintiff's retaliation claims to proceed. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (noting that at the motion-to-dismiss stage, "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation").

Defendants contend that this description of events misunderstands the relevant dates for the purposes of determining temporal proximity. They note that in *Clark County School District v. Breeden*, the Supreme Court held that an EEOC complaint, rather than the later-issued right-to-sue letter, represented the protected activity for purposes of a retaliation temporal-proximity analysis. 532 U.S. 268, 273 (2001). And the Court further held that because the EEOC complaint was made more than twenty months before the defendant's later decision to transfer the plaintiff, the two events were not proximate enough to raise an inference that the transfer decision was retaliatory. *Id.* at 273–74. Analogizing *Clark County* to this case, Defendants argue that because the relevant protected

activity was Plaintiff's filing of the 2013 administrative complaint, rather than the September 2016 resolution of that complaint, it is too distant in time from the issuance of the 2016 Letter to raise an inference of retaliation.  Reply at 4–5.

But that analogy ignores meaningful factual differences between this case and *Clark County*. In *Clark County*, the alleged retaliation was the transfer of the plaintiff to a worse position within her organization.  532 U.S. at 271–72.  As the Supreme Court noted, the defendant could have initiated the transfer immediately after the plaintiff made her EEOC complaint; as a result, the fact that no transfer request was made until years after that complaint eliminated any plausible inference of retaliation.  *Id.* at 272–74.  But here, the alleged retaliatory action was the reimposition of purportedly unfair leave restrictions that were first articulated by the 2013 Letter and then reissued through the 2016 Letter.  This is an action that could not have taken place immediately after Plaintiff's 2013 administrative complaint, because the restrictions from the 2013 Letter remained in effect at that time.  *See* SAC ¶ 17.  And while those restrictions were lifted in November 2014 after the resolution of Plaintiff's grievance about the 2013 Letter, *see id.*, it is plausible that the Defendants would have been wary about immediately reimposing restrictions that had just been lifted while a complaint about those restrictions was still under investigation, and therefore—if they wanted to retaliate in this way—would have chosen to wait out the resolution of the complaint before taking their retaliatory action.

Other alleged facts, moreover, demonstrate that Plaintiff does not rely on temporal proximity alone to plead causation, which further distinguishes his complaint from the one at issue in *Clark County*.  For instance, as described above, the 2016 Letter was issued nearly immediately after Plaintiff applied for disability retirement.  *See* SAC ¶¶ 52–56.  If Defendants wanted to retaliate at a time that it would be most painful for Plaintiff, this fact further supports a possible inference of retaliation.  And Plaintiff has also described numerous alleged instances of being singled out for

worse treatment than his co-workers around the time that the 2016 Letter was issued, which was the continuation of years of allegedly hostile treatment towards him. *See, e.g.*, *id.* ¶¶ 147–148 (Plaintiff alleging he was the only one who had to use the sign-in sheet); *id.* ¶¶ 157–165 (Plaintiff alleging he was marked AWOL for using Union Time when others were not); *id.* ¶ 174 (Plaintiff alleging he was singled out for complaints to Internal Affairs). All of this represents "other circumstantial evidence such as"—but not limited to—"disparate treatment of fellow employees" that further suggests a causal connection between Plaintiff's protected conduct and Defendants' adverse action. *Littlejohn*, 795 F.3d at 319. Of course, as this case moves forward, Plaintiff will have support his claims with evidence, not merely allegations. But at this stage, he has plausibly stated sufficient contentions for his retaliation claims to proceed, and Defendants' motion to dismiss those claims will accordingly be denied.

## VI.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 39.

SO ORDERED.

Dated:  July 31, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge